**UNITED STATES of America**

v.

**John D. RULE, et al.**

**Crim. No. 84–00016P.**

United States District Court, D. Maine.

Sept. 18, 1984.

On Motion for Reconsideration Oct. 19, 1984.

Richard S. Cohen, U.S. Atty., Margaret D. McGaughey, Asst. U.S. Atty., Portland, Maine, for plaintiff.

Samuel Harris Dawson, Gallop, Dawson, Kimelman & Clayman, New York City, for John D. Rule.

Daniel Bates, Portland, Me., for Dennis A. Beckwith.

Stephen W. Devine, Hewes, Culley and Beals, Portland, Me., for Nancy A. Beckwith.

Paula Van Meter, Brooklyn, N.Y., Guy L. Heinemann, New York City, for Thomas Alexander Browning.

Judy Potter, The University of Me. Law School, Portland, Me., for Robert M. Cushner.

Thomas O'Rourke, New York City, for Michael Leto.

Julian Sweet, Berman, Simmons, Laskoff & Goldberg, Lewiston, Me., for Thomas McHugh.

Graydon Stevens, Kelly Remmel & Zimmerman, Portland, Me., for Alan J. Mineart.

David C. Pomeroy, Portland, Me., for Daniel J. Quinn.

Peter J. DeTroy, III, Portland, Me., for Richard W. Robinson.

Richard Berne, New York City, for Gerald Sher.

John D. Patten, Patten & Ganun, New York City, for Craig James Sterner.

Richard Emerson, Portland, Me., for Thomas Streifel.

Peter K. Wilson, New York City, for Kyle Vanden Heuvel.

E. Paul Eggert, MITTEL & HEFFERAN, Portland, Maine, for defendant.

## OPINION AND ORDER ON DEFENDANTS' MOTIONS TO SUPPRESS

GENE CARTER, District Judge.

In sixteen counts the instant indictment charges some or all of the Defendants in this case with possession with intent to distribute marijuana in March 1984 in violation of 21 U.S.C. § 846, 841(a), and 841(b)(6), and all Defendants with conspiracy to commit that offense. The conspiracy count has been severed and will be tried first. Currently before the Court are Defendants' motions to suppress evidence on that count pursuant to Fed.R.Crim.P. 12(b)(3) and 41. These motions have been adopted by all Defendants. The Court has heard the evidence and has considered the oral and written presentations of counsel. The findings of fact and conclusions of law required by Fed.R.Crim.P. 12(e) will be set forth in the discussion of each individual search and seizure.

### I. *Sterner's Car*

The Court turns first to Defendant Craig Sterner's motion to suppress the fruits of the warrantless search of the rented red Mercury Marquis which he was driving when he was apprehended on March 22, 1984. The evidence at the suppression hearing showed that Kyle Vanden Heuvel had rented the automobile and that the rental agreement named Craig Sterner as a second driver. On the day the car was searched, Craig Sterner was the driver.

■ In order to sustain a Fourth Amendment challenge to the search and seizure of a car, a defendant must show a personal, legitimate expectation of privacy in the car searched. *Rawlings v. Kentucky*, 448 U.S. 98, 104–06, 100 S.Ct. 2556, 2561–62, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois*, 439 U.S. 128, 130–31, n. 1, 139, 148–49, 99 S.Ct. 421, 423–24 n. 1, 428, 433, 58 L.Ed.2d 387 (1978); *United States v. Cresta*, 592 F.Supp. 889, 905 (D.Me.1984) (per Gignoux, J.). Only Kyle Vanden Heuvel and Craig Sterner have asserted any personal interest in the rented Mercury Marquis so they are the only two Defendants who may have standing to challenge the search of that car. Sterner, who was the actual driver of the car at the time of the warrantless search, and who had been designated as a second driver by the lessee, plainly had a privacy interest in the automobile. *United States v. Portillo*, 633 F.2d 1313 (9th Cir.1980). The record does not disclose Kyle Vanden Heuvel's intent in giving the car to Sterner, the extent and duration of his use of it, or how long she had been out of possession and control of it. The testimony of the officers to the effect that Vanden Heuvel was the lessee of the car is insufficient to meet Vanden Heuvel's burden of establishing that she had a legitimate expectation of privacy in the car which she had surrendered to Sterner. *See United States v. Dall*, 608 F.2d 910 (1st Cir.1979).

The facts surrounding the warrantless search of Sterner's car are as follows. In late 1983 the Boston Police Department referred James King to agent Michael Cunniff of the Drug Enforcement Agency. King was an informant who was represented to have aided the Boston Police Department in a cocaine investigation. In early

January King came to Cunniff and reported going to a party in New York and being introduced to a Jack Rule and his partner, "T.O.," by two individuals named "Craig" and "Kyle." According to King, Rule had told him that he was a cocaine smuggler and that he used cars to transport marijuana. The DEA had been investigating Rule's activities for several months before that time, and King's information coincided with their suspicions. King was then registered by Cunniff as an informant for the DEA. Shortly thereafter he told Cunniff that he was to meet Rule in Manhasset, New York. Cunniff and another agent waited at the address in Manhasset which King had told them was where Craig and Kyle lived, and saw a car they knew to be Rule's arrive. King and Rule got out of the car. King later reported that Rule had asked him to be a money courier in a drug operation.

A few days later King told the DEA that Rule had asked him to travel to Florida to transport marijuana to New York in the trunk of a rented car. Agent Cunniff and a fellow officer went to the designated airport in Florida and saw Rule, King and a third person arrive and pick up a rental car. No arrests were made and later King explained that King's proposed operation had been cancelled because Rule's source had not produced the marijuana which he was to transport.

On March 22[1] King reported to the DEA that he had learned from Craig that Craig expected to pick up a trunkload, about 300 pounds, of marijuana at a stash house in Naples, Maine in a rented red Mercury Marquis. King described the house from which the marijuana was to be obtained as

a "chalet-type" with an alarm and a garage. He provided directions to the building.[2] King said that he had seen the Mercury Marquis on Congress Street in Portland and had left a note for Craig to meet him at The Bag, a Portland restaurant. Agent Cunniff located the Mercury Marquis and subsequently followed it to 80 North Street where King lived. After a ten-minute stop, the car drove out Forest Avenue in Portland. The car at first took a turn on Forest Avenue that did not coincide with the directions King had given to the stash house. It then turned back, continued out Forest Avenue to Route 302 and generally followed the directions King had provided.

Aerial surveillance of the car was maintained when it was not in sight of the DEA vehicles. After a fifteen-minute stop at the alleged stash house, which has since been identified as one rented by Defendant Cushner, the rented Marquis went to another house in Naples, subsequently identified as being that of the Defendants Beckwith. It backed into the yard, where it remained for about thirty minutes. The car then followed Route 302 to the Portland area, and stopped briefly at a Howard Johnson's restaurant. The driver entered the restaurant momentarily and then returned to the car. The car then entered the Maine Turnpike southbound at Exit 8. Shortly thereafter a Maine State Trooper, alerted by the DEA, pulled the Mercury Marquis over to the side of the highway. Agent Cunniff observed that the back seat of the car was filled with clothes. When asked for identification by the trooper, the driver presented a license bearing the name Craig Sterner. After Sterner got out of

---

1. The record reflects that the only contact between King and the officers during the period from February 16 to March 22 was a brief meeting on March 7 at the courthouse which Spaulding recalled. That was a cursory meeting and Spaulding could not recall any discussion significant to the Rule investigation.

2. According to Agent Cunniff the directions given by King were as follows:

He said that as one traveled north, I believe the direction is on 302 towards downtown Naples, roughly a mile to a mile and a half from downtown Naples one would pass on the right side a building that appeared to be a town building for Naples. Just after that town building, a sort of a driveway angled out from Route 302. One would take that drive, follow it away from 302, bear left at a fork, follow that road to the end and there it would be on the right-hand side at the very end of the road, a couple of hundred feet, I believe, from the end of the road.

the car, Agent Cunniff took the keys and opened the trunk, discovering five bales of marijuana.

■ It has long been established that a warrantless search of a car is not unreasonable, within the meaning of the Fourth Amendment, if the police officers conducting the search have probable cause to believe the car contains contraband. *United States v. Ross,* 456 U.S. 798, 800, 102 S.Ct. 2157, 2159, 72 L.Ed.2d 572; *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The scope of a permitted search is as broad as that which could be authorized by a magistrate in a warrant, and may include closed compartments and containers within the car. *United States v. Ross,* 456 U.S. at 800, 102 S.Ct. at 2159. Defendant Sterner asserts, however, that the agents had no probable cause to search his car and that in doing so they violated his Fourth Amendment privacy rights. He challenges the agent's determination of probable cause and specifically attacks the reliability of the informant King, who provided the information which resulted in the search and Sterner's arrest.

In *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed. 527 (1983), the Supreme Court addressed the issue of assessing informant reliability, in the context of a determination of the existence of probable cause for the issuance of a warrant. The Corut in that case found reliable the "tip" of an *anonymous* informant when details provided in the tip were corroborated by independent police work. The anonymous letter had informed police that Lance and Susan Gates were drug dealers who utilized a certain *modus operandi.* According to the letter, Sue Gates drove the couple's car from Illinois to Florida and left it to be loaded up with drugs. Lance Gates then flew to Florida and drove the loaded car back. Surveillance of the couple corroborated this activity in major part, and this corroboration formed one of the "totality of the circumstances" which was influential in the determination of probable cause:

> Finally, the anonymous letter contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted. The letter writer's accurate information as to the travel plans of each of the Gates was of a character likely obtained only from the Gates themselves or from someone familiar with their not entirely ordinary travel plans. If the informant had access to accurate information of this type, a magistrate could properly conclude that it was not unlikely that he also had access to reliable information of the Gates alleged illegal activities.

*Id.* at ——, 103 S.Ct. at 2335, 76 L.Ed.2d at 552.

■ In the instant case, the DEA agents did not have to rely on an anonymous tip. They were provided with information by an informant who had previously aided the Boston Police Department, who was known to have performed reliably in the past, and who had been specifically referred to the DEA by that Department. Moreover, the preliminary information provided to them by King concerning Rule, who was a subject of a DEA investigation, was corroborated in major part by the agents' observations in New York and Florida.[3]

---

3. At the hearing Defendants tried to attack King's credibility by implying that, in fact, his reports had not been fruitful because no arrests had been made as a result of the trips to Manhasset and West Palm Beach. The Court is not persuaded that this argument has any significance. Nowhere in the record is there any indication that a drug deal was supposed to take place in Manhasset. Agent Cunniff's affidavit stated that King had been asked to fly to New York "to discuss the informant's prospective role in Rule's smuggling operation." Affidavit

¶ 4. The agents corroborated King's flight to New York and meeting there with Rule and were told by King later that Rule had offered King $3000 a week to act as a money courier for him.

The information about the trip to West Palm Beach was exactly of the type that indicated the informant's reliability in *Gates:* "accurate information as to the travel plans of [a third party] ... of a character likely obtained only from [the third party] or from someone familiar with [his] not entirely ordinary travel plans." *Gates,* 462

Just as King had seemed to know future plans of Rule, his information concerning the details of Sterner's future activities was largely borne out by police observation. The red rented Mercury Marquis was found by the agents where King said it would be, and it followed the route to Naples King had described, arriving at the house King had said was a stash house. The Sterner car then proceeded to the Maine Turnpike, following a course that was entirely consistent with the informant's information that Sterner would be transporting drugs to New York. When the officers stopped the Sterner car, Agent Cunniff noticed that the back seat was piled high with clothing and that the name on the license given to the officers was *Craig* Sterner. King had told Cunniff earlier that day that "Craig expected to transport a trunkload of marijuana ... in a rented Mercury Marquis." Cunniff Tr. 14. Having ascertained that a person named Craig was driving the rented Mercury Marquis, Cunniff inferred from the presence of the large amount of clothes in the back seat that something else, probably the marijuana suggested by King, occupied the trunk. All of these facts provided the probable cause needed by the police to stop and search Sterner's car on the ground that it likely contained marijuana.

## II. *Quinn and Striefel*

After the discovery of marijuana in Sterner's car and his arrest, the DEA began the process of preparing to seek warrants to search both the houses in Naples at which Sterner had stopped on the afternoon of March 22. Police officers were sent to each of the houses in the early evening to "secure" them for arrival of the warrants. Four officers arrived at the Cushner house at 7:30 P.M. and determined that only a dog was in the house. Four officers staked out the house to await issuance of a warrant. Shortly after 10:30 p.m., while two of the officers were out making a phone call, two cars drove into the Cushner driveway. The first car, driven by Defendant Thomas Streifel, pulled up in back of one of the agent's cars. The other car, driven by Defendant Daniel Quinn, drove up in back of the Streifel car. The Defendants were asked by a uniformed officer for identification and to explain why they were at the cottage. Quinn produced a car registration in his name and Streifel produced his license and the rental agreement for his car. Their identification was not returned to them at any time during the succeeding course of events. Both Defendants were told by the officers when they arrived to put their cars in park and turn off the motors. They were told that they could not leave until Agent Steadman, the head of the operation, returned. When Quinn was asked if the officers could search his car, he refused, saying that they would have to get a warrant.

Upon hearing by radio transmission of Quinn's and Streifel's approach, the two absent officers returned moments after Quinn and Streifel drove in. They parked their cruiser in back of Quinn's car in such a manner that neither Quinn's nor Streifel's car could be moved from the driveway. Agent Steadman testified that Quinn and Streifel had been told to get out of their cars and that they were deliberately kept apart. At that point they were clearly in custody. The officers who had blocked them in had no intention of letting them leave. Agent Steadman testified, in fact, that from the time Quinn and Streifel arrived he hoped and intended that they would stay. Also, he refused to allow Streifel to make a phone call. He explained this by saying that phone calls are allowed only after a person has been processed. Moreover, it is clear that a reasonable person in Defendants' position would have believed he was not free to leave.[4]

---

U.S. at ——, 103 S.Ct. at 2335, 76 L.Ed.2d at 552. The explanation of the failure of the drug transaction to occur was also a believable historical event. Therefore, at the time King provided information about the stash house and Sterner's prospective drug run, the agent's belief in the information provided by King was perfectly reasonable.

**4.** When queried on cross-examination as to why he did not specifically tell Quinn and Streifel that they were free to go, Agent Steadman testi-

*United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). Initially Defendants had been told by Cpl. Hutto that they could not leave. Later they were blocked in by a police car and confronted by four armed officers and a police dog. Their identification was retained by the officers.

■ Since both Quinn and Streifel were in custody, they should have been advised of their rights before any questioning of them was begun. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The agent who did the questioning, DEA Agent Steadman, testified that he had no probable cause to arrest Quinn and Streifel when they arrived. According to his testimony, the probable cause for their arrest began to develop from inconsistencies in their various responses to Steadman's questions concerning their purpose at the cottage, where they had previously met, and how long they had known each other. These theoretically incriminating responses, made as the result of the officer's interrogation of the Defendants while they were in custody, must be suppressed because they were made before Defendants had been advised of their constitutional rights per *Miranda.*

### A. Streifel

■ In response to Cpl. Hutto's request, Defendant Streifel consented to a search of his car. The voluntariness of that consent is immaterial at present since the search revealed no incriminating evidence. When Cushner arrived he told the officers that he recognized his friend Tom [Streifel] whom he was expecting for a few days of skiing. This information coincided with Streifel's expressed purpose for being at the cottage and was confirmed by skis and a suitcase seen in Streifel's car. The

DEA had received no information from King concerning Streifel and, as will become evident *infra,* nothing revealed in the subsequent search of Cushner's house or in the check on Streifel's license provided any more indication, prior to his arrest, that he was involved in a violation of the law. Therefore, his arrest was premised merely on his late night arrival at a house which the agents suspected to be a stash house and his association with Cushner and Quinn.[5] While such facts might give rise to suspicion, they do not rise to the level of probable cause necessary to arrest an individual for alleged participation in a drug conspiracy. *See Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979); *United States v. DiRe,* 332 U.S. 581, 593–94, 68 S.Ct. 222, 228, 92 L.Ed. 210 (1948); *United States v. Capers,* 685 F.2d 249, 251 (8th Cir.1982).

■ Since Streifel's arrest was not based on probable cause, it was unlawful. The fruits of that unlawful arrest, the cocaine found in his pocket during the booking search, his telephone records, and the items found in the inventory search of his car, were "come at by exploitation of that illegality," rather than "by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). They are, therefore, inadmissible against him.

### B. Quinn

After Agent Steadman's questioning of Quinn and Streifel, he busied himself with other matters while Trooper Gallagher twice circled Quinn's car with his trained dog. The dog twice "alerted," which indicated to the officers the possible presence of marijuana in the trunk of the car.

---

fied that he didn't think it was necessary. He explained: "We have to give up everything else—I didn't think we had to give up more." When he encountered resistance to his overtures from Quinn or Streifel, he did not react aggressively. This he explained on cross-examination by saying, "I am patient. I can wait, Sir."

**5.** The allegedly inconsistent statements which Streifel made and which gave rise to Agent Steadman's suspicions were unlawfully elicited in violation of Defendant's Fifth Amendment rights. *See* text, *supra,* at 1232. They cannot, therefore, form the basis for any determination of probable cause to arrest.

Quinn was asked if the officers could search the trunk and was warned that anything found in such a search could be used against him. Trooper Gallagher also told Quinn that if he did not permit the search, the agent could get a warrant. Quinn opened the trunk and the dog jumped in, signalling the presence of at least the odor of marijuana. The search revealed coffee grounds, marijuana seeds, and a blanket on which Gallagher smelled marijuana. Quinn asked that the dog be removed, which was done, and the trunk was closed. Shortly after these events, Agent Steadman, who had been told of the earlier search, asked Quinn if a second search might be performed. Steadman testified that he made the request because he had concern about the legitimacy of the search of the trunk conducted by Trooper Gallagher. Steadman informed Quinn that the car would be subject to seizure if evidence showed that it had been used to transport drugs. Saying he understood, Quinn opened the trunk again, disclosing the same items plus some traces of baking soda.

■ All the Defendants seek to suppress the fruits of the warrantless searches of Quinn's car. It seems clear that of all the Defendants, only Quinn, to whom the car was registered, and who was alone in it when it was stopped, has a Fourth Amendment privacy interest in the car. While the car was within Defendant Cushner's yard at the time it was searched, he had no legitimate expectation of privacy in the interior of the car. It belonged to Quinn, whom admittedly Cushner did not know, and it had arrived in his yard unbeknownst to him. He had no control over the car or ability to exclude people from it. In fact, no relationship was shown between Cushner and Quinn or Quinn's car other than its unforeseen arrival at his house. *See Rawlings v. Kentucky*, 448 U.S. at 104–06, 100 S.Ct. at 2561–62. Therefore, only Quinn has standing to object to its search.

The Government argues that the search was consensual and, therefore, did not violate Quinn's rights. In the recent case of *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), the Supreme Court explicitly delineated the principles of investigative detention under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). As Justice White stated:

> Detention may be "investigative" yet violative of the Fourth Amendment absent probable cause to arrest. In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or of his automobile or other effects. *Nor may the police seek to verify their suspicions by means that approach the conditions of arrest.*

*Florida v. Royer*, 460 U.S. at 499, 103 S.Ct. at 1325 (emphasis added).

■ The officers here plainly sought to verify their suspicions by means that were the *equivalent* of arrest. *See* text, *supra.* Having elicited unsatisfactory explanations with their unlawful interrogation, the officers sought to confirm the suspicions so created by using a dog to sniff for drugs in Quinn's car. *See Royer* at 504, 103 S.Ct. at 1328. It was only after this procedure, made possible and suggested by the illegal detention and interrogation, that Quinn gave his consent to the search of his trunk. There was no probable cause to arrest Quinn at the time he was detained.[6] Since Quinn was being illegally detained when he consented to the search of his trunk, the consent was tainted by the illegality and could not justify the search. *Id.* at 506, 103 S.Ct. at 1329.

### III. *Cushner*
#### A.

■ About twenty to thirty minutes after Quinn and Streifel arrived at the Cushner house, a blue pickup truck arrived. In response to the inquiries of the officers, the driver identified himself as Robert

---

6. In fact Agent Steadman testified that probable cause for the arrest did not arise until the baggie of marijuana was found pursuant to an illegal entry into Cushner's house later that night. *See* text, *infra.*

Cushner, the renter and occupant of the house. The license he produced confirmed his identity. In response to further inquiry, Cushner stated that he knew Streifel, whom he had met through mutual friends, and was expecting him. He said he did not know Quinn. Agent Steadman then advised him of his rights. Cushner seeks first to suppress his statements about knowing Streifel on the grounds that he should have been given *Miranda* warnings sooner since he was in custody. Evaluation of Cushner's position shows that Cushner was in custody from the time he identified himself as the renter of the cottage. Certainly two of the *foci* of the investigation being conducted by the police were the alleged stash house and any of its inhabitants. Although he was not physically blocked by the officers, Cushner was confronted by the same array of police personnel as Quinn and Streifel. The officers did not inform him that he was free to go, and indeed the officers had far more motivation for detaining Cushner, the occupant of the alleged stash house, than they had to detain Quinn and Streifel, whom Agent Steadman "intended" would remain in the yard. Since Quinn and Streifel were being held, a reasonable person in Cushner's position would likewise have thought he was not free to go. *See United States v. Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877.[7] Since Cushner was in custody but had not been advised of his *Miranda* rights at the time he responded to questions concerning Quinn and Streifel, those responses must be suppressed as against Cushner.

### B.

■■■ Defendant Cushner further seeks to suppress as against him the seizure in his yard of Defendants Streifel and Quinn and of any evidence found in Quinn's car. In the recent case of *Segura v. United States,* —— U.S. ——, ——, 104 S.Ct.

3380, 3389, 82 L.Ed.2d 599 (1984), the United States Supreme Court made clear that "securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought, is not itself an unreasonable seizure of either the dwelling or its contents." The informant's tip, together with the marijuana found in Sterner's car after it visited Cushner's house, provided probable cause to secure the house. While the curtilage of that house is, as Defendant argues, subject to his Fourth Amendment privacy interest, it is not that privacy interest but his possessory interest that is interfered with when officials secure his property. While the officers may not have been entitled to have remained on the premises after determining that it was unoccupied prior to the arrival of Quinn and Streifel, they were entitled to accost those Defendants as part of the securing process once they appeared on the premises.[8] The conduct of the officers in stopping and interrogating Quinn and Streifel did not constitute a search of Cushner's property, and that conduct occasioned no practical interference with his possessory interests. *See id.* at ——, 104 S.Ct. at 3390. The officers did not enter Cushner's yard and discover something he had protected there. *See* discussion of standing to suppress fruits of search of Quinn's car, *supra,* at 1233. Rather, the officers protected whatever evidence might be contained on the premises by preventing Quinn and Streifel from entering any further than they had.

### C.

■■■ While standing outside the house, Cushner told Cpl. Holmes that he wanted to go to bed. Holmes informed Cushner that he could only go inside if he were accompanied by the police. Holmes then asked if the officers could go inside to

---

**7.** That fact that Defendant Cushner had a flat tire when he arrived at his house has not influenced the Court's determination that he was in custody. The record does not indicate that the tire was so flat as to prevent driving on it; Cushner had driven with it from the Beckwiths'

house. Moreover, the flat was in no way attributable to the conduct of the police officers.

**8.** It is significant to note in this respect that Cushner's house is the last house at the end of a dead end road.

make a phone call. He told Cushner that he need not allow them to enter and that if they did so anything that they found in plain view could be used against him. Cushner acceded to the officer's request. After going into the house, Cushner was told that the officers would have to do a protective walk-through in order to assure that there were no other persons or weapons in the house. The agents discovered a baggie containing a small amount of marijuana on Cushner's bureau together with other drug-user paraphernalia. Cushner now seeks to suppress the fruits of that warrantless search.

The record makes clear that there was no need for the agents to use the telephone inside Cushner's house. The phone call made was *in fact* to the Assistant United States Attorney *to inform her that the officers were inside the house and that they would arrest the three Defendants present.* Prior phone calls had been made to the DEA headquarters via a patching system at the Maine State Police barracks in Scarborough. Also, officers had on at least one occasion made a phone call from a nearby pay phone. Since two other means of transmitting information to DEA headquarters were readily available, the request to use Cushner's telephone was patently a pretext for gaining access to the interior of the house. This conclusion is confirmed by the message recorded in the Maine State Police radio log for March 22, 1984. When the agents in the field called in through the patching system at 7:30 that evening and asked for instructions, they were "[a]dvised to secure the residence, if anyone is at the residence, attempts to enter the residence or they suspect someone may be there, *take the residence."* Govern-

ment Exhibit 31 (emphasis added). Having been instructed to "take the residence," the officers obeyed by devising a means to get inside it.

Such a ruse might not in all cases vitiate consent. *See* W. LaFave, *Search and Seizure,* § 8.2(n) (1978). The critical question in making that determination is whether the police in effect deprived the Defendant of a free choice in deciding to surrender his privacy. While the Government argues that Cushner was well advised of the possible consequences if he were to allow the officers to enter for whatever reason, the Court must disagree. The officers here also deceived Cushner as to the scope of their pretextual intrusion. They informed him only that anything they observed while inside making the phone call could be used against him. The officers made that call from a phone in the kitchen.[9] This differs significantly from their professed need to perform a walk-through,[10] which need was expressed to Cushner only *after* he and the officers were already inside the house. Since Cushner did not know to what he was consenting when he agreed to allow the officers to make a phone call, his consent was not freely and voluntarily given. *See Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1973); *State v. Bailey,* 417 A.2d 915 (R.I.1980). Since there was no effective consent to search and the officers had no warrant to search at that time, those items discovered by the officers during their occupancy of the Cushner house are not admissible against Cushner at trial, unless upon some other theory.

No other Defendant has shown any interest in Cushner's house which might give rise to a privacy interest in those premises.

9. In his testimony Agent Steadman attempted to justify the officer's entry into the bedroom on the basis that they were required to accompany Cushner when he requested to disconnect a telephone recording machine attached to the telephone extension there. The force of this justification is negated by the circumstance that Cushner was never told *before actually electing to* enter the bedroom that if he did so, an officer would accompany him. Moreover, as discussed in the text, Cushner was deceived as to the purpose for and scope of the entry into his house.

10. It is arguable as well that no such walk-through was necessary since the police had already determined that there was no one in the house but a dog which was immediately quieted by Cushner. If the Defendant had been kept in sight of the officers in the kitchen, no greater intrusion would have been required.

Therefore, no other Defendant has standing to suppress these items. *See Rakas v. Illinois*, 439 U.S. at 130–131, 99 S.Ct. at 423–424.

### D.

■ Agent Steadman testified that he did not have probable cause to arrest Cushner until he saw the baggie of marijuana on his bureau. Cushner, therefore, argues that without the evidence found in his house there was no probable cause to arrest him. In a slightly different context the Supreme Court has stated that "the fact that the officers did not believe there was probable cause and proceeded on a consensual or Terry-stop rationale would not foreclose the State from justifying Royer's custody by proving probable cause." *Florida v. Royer*, 460 U.S. 491, 507, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229, *citing Peters v. New York*, 392 U.S. 40, 66–67, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968). It seems clear here that even absent the baggie of marijuana the officers had probable cause to believe that Cushner was involved in committing or had committed a crime. His house had been identified by informant King as a stash house containing 1500 to 2000 pounds of marijuana. An individual, identified by King as a marijuana courier, had been stopped with a trunk full of marijuana shortly after he left Cushner's house, where King had said he would go to get a load of marijuana.[11] Cushner's identification of himself as the renter and occupant of the suspect house provided the necessary link to the criminal activity thought to be going on in the house to establish probable cause. Cushner's arrest was, therefore, lawful on the basis of evidence independent of the observations of the officers while in the house and his statements made at his bail hearing bear no taint.

### IV. *The Beckwiths*

At the same time that the above-described securing of the Cushner residence was taking place, five officers went to the second house at which Sterner had stopped in Naples for the purpose of securing it pending issuance of a search warrant. Cpl. Coleman, a uniformed, armed officer wearing a bulletproof vest, knocked at the door. The knock was answered by Defendant Dennis Beckwith. When Coleman informed him the officers were securing the house and asked if they could come in, Beckwith asked if they had a warrant. Officer Coleman replied that they did not have one in hand but that one was on the way. In response to this, Beckwith permitted the officers to enter, saying, "You might as well." No warning was given Beckwith concerning the possible consequences of the entry, nor was he offered the opportunity to come outside. Once inside, the officers asked if there were weap-

---

**11.** At argument Defendant Cushner's attorney contended that the directions to the stash house provided by the informant did not lead to the Cushner house, but more aptly described the route to the Beckwith house. The Court does not agree. Agent Cunniff testified to the directions provided him by King. *See* note 2, *supra*. Although the distance between Naples and the road leading to Cushner's house may not be exact, the directions were an accurate means of finding that house.

Defendant's argument is based in part upon the proposition that when one compares the directions given by King with the layout of the road exemplified in Government's Exhibit 3, the directions improperly describe the course of travel to the Cushner house. The directions state that after the town building, "a sort of driveway angled out from 302. One would take that drive, follow it away from 302, bear left at a fork and [follow that road to the end]." Coun-

sel argues that Government's Exhibit 3 shows that the proper course of travel requires that one make a right hand turn after taking the "driveway angled out from Route 302." The omission of this turn from the directions is contended to be a significant discrepancy. The Court is satisfied that the right turn pointed to is subsumed in that part of the directions that "[o]ne would take that drive [and] *follow it away from 302*" (emphasis added). Government's Exhibit 3 clearly displays that if, after taking the driveway, one did not initiate the right hand turn, one would simply return to 302, thus failing to follow the driveway "away from 302."

Moreover, the Beckwith's house is not located at the end of a road. Finally, while there is some dispute about King's characterization of Cushner's house as a chalet-type, the Beckwith house in no way fits that description.

ons present; Beckwith replied affirmatively. Sgt. Anastasoff then informed Beckwith of his rights, and the officers told him they would have to look through the rest of the house for safety purposes. In their examination they discovered drug paraphernalia, marijuana plants, several weapons and bales of marijuana which had been mostly covered by a tarp. Subsequently, Beckwith made several incriminating statements. Beckwith had told the officers that he was expecting his wife to arrive, which she did at about 12:30 a.m. The officers obtained from her by questioning general information identifying her. They read her a statement of her *Miranda* rights. She, too, made some incriminating statements. The Beckwiths now seek to suppress evidence discovered when the police made the warrantless entry into their house and the statements made by them to police in the course of those events.

### A.

 It seems clear at the outset that of all the Defendants the Beckwiths are the only ones who live in or had any expressed relationship, possessory or otherwise, to their house, Nancy Beckwith as owner, and Dennis Beckwith as her resident spouse. They are, therefore, the only Defendants with personal privacy interests in the house and are the only ones with standing to challenge its search. In the same manner as Fourth Amendment rights, Fifth Amendment rights are purely personal; therefore each Defendant may seek to suppress only his or her own statements. *See Couch v. United States,* 409 U.S. 322, 323, 327–28, 93 S.Ct. 611, 613, 615 (1973).

### B.

 The Government asserts that the search of the Beckwith house was consensual and did not, therefore, violate Defendants' Fourth Amendment rights. The totality of the circumstances surrounding Dennis Beckwith's consent must be examined to determine if in fact that consent was voluntary. *Schneckloth v. Busta-*

*monte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854.

 It must first be noted that the officers' initial claim of authority for their presence at and effective seizure of the Beckwith property was invalid. The officers told Beckwith that they were securing the premises. Such action has been held a reasonable seizure only when it is taken "on the basis of probable cause." *Segura v. United States,* —— U.S. at ——, 104 S.Ct. at 3387. This instance differs from that of the securing of the Cushner residence in that there the officers had probable cause to believe that there was evidence on the property which might be destroyed. In the case of the Beckwiths, the officers had a suspicion, but nothing more. The informant had never mentioned anything about either the Beckwiths or the Beckwiths' house. In fact, it appears that the DEA agents did not know anything about the Beckwiths until Craig Sterner was followed to their house on March 22 after his presumed pick-up of the marijuana at the house designated by the informant as a stash house. All the police knew was that Sterner had stopped there for some thirty minutes before heading south.

The Government contends that three additional facts, in addition to Sterner's stop there, give rise to probable cause to search the Beckwith house: (1) that informant King had said that Rule maintained more than one stash house; (2) that the Sterner vehicle was seen "backed" into the Beckwith driveway; (3) that the Mineart truck went from the Cushner house to the Beckwiths' with the Sterner car. These facts do not raise the quantum of evidence known by the securing officers to the level of probable cause.

Although Rule may have had more than one stash house, the informant had specifically designated only the Cushner house, and indeed the Sterner car had gone there and later been discovered filled with marijuana. There is nothing inherently suspicious about backing into a driveway rather than driving in frontwards. Although backing in may facilitate the loading of a

car's trunk, it also facilitates easier egress from the driveway.

The Government suggests that the presence of the Mineart truck at both the Cushner and Beckwith houses shows a link between the designated stash house and the Beckwith house. In fact, its presence is of no more significance than the presence of Sterner in both places and amounts only to suspicion or cause to investigate further. Moreover, the record does not show that the officers saw fit to further investigate, at that time, the Mineart truck or its occupants even though the truck was also backed into the Beckwith driveway. While the officers certainly must have been curious about the Beckwith house, they did not have probable cause to believe that contraband was being held there. All the indicia were that it was being held at Cushner's cottage.

■ In the face of the officers' asserted authority to be on his property, Dennis Beckwith, obviously cognizant of his Fourth Amendment rights, asked them if they had a warrant. It was only after he was informed that one was on the way that he allowed the officers to enter. In acquiescing to the wishes of the police, the Defendant was merely submitting to what he had been told was inevitable. Addressing similar circumstances in a well-reasoned opinion, the Second Circuit has held that if in fact there were grounds for the issuance of a search warrant, then "the well-founded advice of a law enforcement agent that absent a consent to search a warrant can be obtained does not constitute coercion." *United States v. Faruolo*, 506 F.2d 490, 495 (2d Cir.1974). Conversely, when a search based on a warrant is not inevitable, misinforming the defendant is unduly coercive because it "conveys to the individual the erroneous belief that he cannot protect his privacy by refusing to give consent."[12] LaFave, *supra*, § 8.2 at 648.

In this case a warrant did issue for the Beckwiths' house. It was based, however, on Agent Cunniff's affidavit which described the fruits of the officers' warrantless search of the house, including the weapons and bales of marijuana. As previously discussed, before the entry into the house there was no probable cause for issuance of a search warrant or for arrest of the Beckwiths. The Magistrate did not, and could not have, issued a valid warrant for the Beckwith premises on the basis of the information contained in the affidavits supporting the application for the warrant, which was gathered prior to the entry onto those premises. *See* text, *infra*.

■ The record plainly shows the Defendant Dennis Beckwith was aware of his Fourth Amendment rights and would have exercised them but for the misrepresentation of the officers. His consent cannot therefore be deemed voluntary, and the officers' entry into the Beckwith house, based on that involuntary consent, was unlawful.

■ It is plain that the items discovered in the Beckwiths' house must be suppressed as against them as the fruits of an illegal entry and search. Moreover, the statements of both Beckwiths are so inextricably bound up with the illegal entry and search of the Beckwith premises that they must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The Court must consider whether suppression in this instance will serve a deterrent purpose since the entering officers were only following instructions in securing the Beckwith premises and telling Dennis Beckwith that a warrant was on the way. This case is different, however, from the recent case of *United States v. Leon*, —— U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) in which the Supreme Court

---

**12.** Relying on the recent First Circuit opinion in *United States v. Kimball*, 741 F.2d 471 (1st Cir. 1984), the Government asserts that an officer's assertion that he will get a warrant has no negative effect on voluntariness. In that case the First Circuit examined the district court's factual finding of a voluntary consent, setting forth factors from the record which supported the district court's decision. The Court did not address the situation presented here in which an officer misrepresented the status of the warrant to the defendant.

established "a good faith exception" to the exclusionary rule in cases where officers have relied in good faith on a warrant which subsequently was determined to have been improvidently issued. In *Leon* the Court refused to exclude the evidence illegally obtained stating, "Where the official conduct was pursued in complete good faith ... the deterrence rational loses much of its force." *Id.* at ——, 104 S.Ct. at 3419. Here there had been no impartial determination by the magistrate, upon which the invading officers relied. Rather, they were instructed in their activities by other officers who had formulated the plan of attack without paying adequate heed to the rights of those at whom the operation was directed.

 Official conduct must be viewed as a whole, with an examination of the conduct of all the participating officers. Where as here, some of the officers initiate the securing of a dwelling without probable cause and misinform the active officers as to the status of a warrant, the official conduct cannot be said to be "pursued in complete good faith." Just as the officers can rely on the collective information of all officers involved in an investigation as a basis for their actions, *see Whitely v. Warden*, 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971); *United States v. Balsamo*, 468 F.Supp. 1363, 1380, n. 22 (D.Me.1979), so they must be charged with that collective knowledge when it should have kept them from acting. If the good faith of officers executing orders which were recklessly issued can validate the conduct of those giving the improvident orders, then there will be no check on the conduct of the police in large scale investigations. Such investigations are often controlled from a home base and executed by field officers who, as was the case here, know very little about the actual facts of the case.

## V. *Searches Pursuant to Warrants*

In the early morning of March 23, 1984, the DEA applied for and was issued search warrants for the Cushner and Beckwith houses. Supporting the application for these warrants was an affidavit by DEA Agent Michael Cunniff. On March 27, 1984, warrants were issued to search a 1980 Buick LaSabre, Maine registration number 66542F, registered to Brigeen Farms; a red Saab Turbo with New York registration 7595AUB, registered to Richard Rule; a red rented Mercury Marquis rented to Kyle Vanden Heuvel; and a blue 1973 Chevrolet pickup with Maine registration 73731F, registered to Long Lake Lobster Co. Supporting the applications for these warrants in varying configurations were Agent Cunniff's initial affidavit and four supplemental affidavits, three of Agent Cunniff and one of Agent Steadman.[13]

Agent Cunniff's initial affidavit relates information provided to him by confidential informant King and the corroboration of some of that information by DEA agents. It also relates uncorroborated information provided by King during an interview on the evening of March 22, that the informant, during the month of the arrests in this case, made eight drug runs for Defendant Rule. At the hearing on the motion to suppress, it was disclosed that King had acted as a drug courier for Rule on these occasions unbeknownst to the DEA agents and against their express instructions. Both Agent Cunniff and Trooper Spaulding were very angry and upset to learn of King's double-dealing in their March 22 interview.

 None of the circumstances surrounding King's disclosure to the agents of his eight drug runs were presented to the Magistrate, either in the initial affidavit or at the time that affidavit was resubmitted with other materials in support of applications for warrants to search various of the Defendants' cars. There was no indication

---

**13.** Agents also sought a warrant to search the purse of Nancy Beckwith. Upon the Government's representation that it will not use any of the contents of the purse at trial, the Court will not address the motion to suppress the contents of that purse.

in any of the supporting affidavits that these trips represented King's personal, illicit participation in drug trafficking without the knowledge or authorization of the DEA agents. It was not indicated that the trips had provoked any concern in the DEA agents about King's reliability. Neither was there any indication that the DEA agents themselves reassessed, or felt they had cause to reassess, King's credibility after being told of his unauthorized activities.

One of the primary values of the warrant process is that it permits *"informed* and deliberate determinations" of probable cause to be made by a neutral and detached magistrate. *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). That value was severely undermined in this case by the nature and presentation of the facts set forth in Agent Cunniff's affidavits. First, the nondisclosure of facts concerning King's double-dealing and the DEA's reaction to it deprived the Magistrate of information essential to *his assessment* of the credibility of King, the informant whose information was the mainstay of the entire investigation. Second, the structure of the affidavits was such as to wrongly enhance the credibility of King's information.

Paragraph 3 of Cunniff's initial affidavit states that Cunniff had been involved in an investigation of John Rule and that:

[i]n the course of this investigation, a confidential informant approached Drug Enforcement Administration agents and Maine State Police detectives and offered to cooperate. The confidential informant told investigating agents that John Rule ... had been involved in smuggling large quantities of marijuana for a number of years.

The subsequent paragraphs proceed to detail the activities of Rule and King, including King's eight drug-running trips. The affidavit unmistakably creates the distinct impression that the informant King was an active criminal freely coming forward for the first time, on his own initiative, from the depths of a criminal organization with information about the ongoing activities of the organization. Such information, of course, were that the case, could properly be viewed as highly reliable. One cannot discern from the affidavits that King was a registered confidential informant who met Rule only after he had initially made contact with the DEA and whose activities with Rule were thought by the DEA agents to be those of an infiltrator subject to DEA instruction and control. Information of this type is inherently less reliable than that provided by a criminal voluntarily coming forward, even without the disclosure that King was a double-dealer. It is plain, therefore, that the Magistrate, because of both the structuring of the affidavit and the nondisclosure of essential information relating to King's credibility, was unable fully to evaluate on a proper understanding the information provided him in the affidavits.

In the case of *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the United States Supreme Court addressed the issue of the consequences of misstatements appearing in a search warrant. If the misstatements were intentionally or recklessly made, the Court must disregard the affidavit's false material. If "the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." [14] *Id.* at 156, 98 S.Ct. at 2676. Although *Franks* addressed the issue of misstatements in the affidavits, its reasoning applies equally to cases involving material omissions. *United States v. Melvin,* 596 F.2d 492 (1st Cir. 1979); *United States v. Dennis,* 625 F.2d 782 (8th Cir.1980).

---

**14.** The Court is aware that *Franks* determinations are usually made after a hearing held to determine whether the statements in the affidavit were false and intentionally or recklessly made. In this case no Defendant moved for a *Franks* hearing. The information forming the basis of the Court's findings was adduced at a hearing on Defendants' motions to suppress.

In examining the affidavits in this case, the Court is acutely mindful of the teaching of the Supreme Court in *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965), that:

affidavits for search warrants ... must be tested and interpreted by magistrates and courts in a common-sense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

The Court cannot, however, countenance the omissions from these affidavits. The information not submitted bore directly on the credibility of the informant and was the only information which in any way might have undercut the presentation of the informant's data as that of a reliable source.

■■■ At oral argument on the motions to suppress, the Assistant United States Attorney represented to the Court that it was she who had decided not to include the information about King's double-dealing because, in her view, it did not affect his credibility. Any determination of this type, however, was properly for the Magistrate, not the prosecutor, and in the view of the Court was clearly wrong. As an officer of the court, the Assistant United States Attorney was charged with the responsibility of seeing that the Government provided the Magistrate with available and relevant information to make an *informed* decision as a truly neutral and detached decision maker. The omissions were not, in this case, the product of a non-lawyer's hasty miscalculation in the midst of a criminal investigation. They are, instead, the result of a deliberate decision by the Assistant United States Attorney to herself perform a part of the function of the detached, neutral Magistrate. Such an unwarranted arrogation of the Magistrate's function demonstrates at best, in view of the critical mate-riality of the omitted material to the reliability of the informant, a reckless disregard for the truth of the totality of the contents of the affidavit presented to the Magistrate.

In the interests of deterring such conduct in the future, *see Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667, the Court will consider the portions of the affidavits relating information provided by the informant King only to the extent that information provided by King was independently corroborated by the investigating officers. To be more explicit, in assessing the validity of the searches made pursuant to warrants, the Court will consider the information initially provided by King and set forth in paragraphs 3–6 of the Cunniff affidavit. The Court will disregard paragraph 12 and the parts of paragraph 13 that were provided solely by the informant. Similarly, the Court will disregard the portions of paragraph 3 of Agent Cunniff's Fourth Supplemental Affidavit pertaining to King's disclosures on March 22, paragraph 6 of Agent Cunniff's Third Supplemental Affidavit, paragraphs 4, 5 and portions of paragraph 3 of Agent Cunniff's Second Supplemental Affidavit.

### A. The Search of Sterner's Car

After the seizure of Sterner's car with its cargo of marijuana, application was made for a warrant to search it. The application was supported by Agent Cunniff's initial and second and third supplemental affidavits as well as by the supplemental affidavit of Agent Steadman. Even without the uncorroborated information provided by informant King, the affidavits plainly set forth probable cause for the search. As discussed previously, King's corroborated information and the officers' observations based on that information provided probable cause for the initial search of Sterner's car. The fact that marijuana was discovered in the car further bolstered the showing of probable cause made before the Magistrate. Since there was probable cause to believe that the car had been used in criminal activity and that it contained evidence

of that activity, the search made pursuant to the warrant was legal.

### B. The Search of the Quinn Car

█ Also on March 27, 1984, DEA agents applied for a warrant to search the car which they had seized from Daniel Quinn at the Cushner house. The application was supported by Agent Cunniff's initial affidavit and second and third supplemental affidavits, as well as by Agent Steadman's supplemental affidavit. Paragraphs 4–9 of Agent Steadman's Supplemental Affidavit set forth the circumstances surrounding Quinn's arrest. As has been discussed previously, Quinn's statements, set forth in paragraphs 4 and 6, and the results of the canine sniff investigation and subsequent searches of Quinn's car, set forth in paragraphs 7 and 9, were obtained illegally in violation of Defendant Quinn's Fourth and Fifth Amendment rights. They cannot be used, therefore, as a basis for the finding of probable cause for the later search of Quinn's car for that would be an exploitation of the prior illegality. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441; *Grimaldi v. United States*, 606 F.2d 332 (1st Cir. 1979).

The only other information in the Steadman affidavit pertaining to Quinn is Steadman's statement that he arrived at a designated stash house at 10:45 p.m. and Streifel's statements that he knew Quinn only by his first name, had met him coincidentally in a bar that evening, and that in response to Quinn's expressed interest, had offered to show Quinn Cushner's cottage as a possible summer rental. Cushner's statements that he knew and was expecting Streifel, but did not know Quinn, corroborated this information. The only other information concerning Quinn in any of the affidavits is Cunniff's statement that a consent search of the Quinn car had yielded marijuana seeds. Since the Court has concluded that the search was not a consent search but, rather, was done while Defendant was illegally detained by the officers, this information cannot be treated as represented by Cunniff, as "one among other factors providing probable cause." Third Supplemental Affidavit, paragraph 3.

Without the statements and evidence from the searches, the affidavits do not support a finding of probable cause. Although Quinn did arrive at a designated stash house late at night, there was no indication that he had been there before, or that he was expected. In fact, he was unknown to Cushner, the renter of the house, who readily admitted knowing and expecting Streifel. Without the tainted information, then, there was no independent basis, *see Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319; *Grimaldi*, 606 F.2d at 336, from which the Magistrate could determine probable cause, and the warrant is, therefore, invalid. The fruits of the warrant search of the Quinn car will be suppressed as against Quinn.

### C. The Search of John Rule's Car

John Rule also seeks to suppress the fruits of a search and seizure of a red Saab with New York registration 7595AUB pursuant to a warrant issued on March 27, 1984. Submitted in support of the warrant application were the four affidavits signed by Agent Cunniff and one by Agent Steadman.

█ Relying on *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Government asserts that Rule has no standing to challenge the search and seizure of the car because he has neither an ownership nor a possessory interest in it. The Court must disagree. It is true, as the Government asserts, that the Saab was registered to Richard Rule, John Rule's brother, and that John Rule was not in it at the time it was seized. An analysis pegged on these facts alone, however, would ignore the realities of the situation. John Rule bought the car, and he was the only one seen driving it from early February 1984 on. Nothing in the record indicates that Richard Rule was other than the titular owner. For purposes of the DEA's investigation, the car was John Rule's.

Trooper Spaulding testified that he knew John Rule "was driving and owned a red Saab Turbo." Spaulding Tr. 5. When Spaulding heard from King that Rule was in town, he immediately went to the airport to look for the red Saab. When the DEA sought permission to seize the car it was as a penalty for John Rule's supposed activities with it, and the search of the car was executed in order to find evidence of John Rule's activities which he might have locked inside the car or the luggage locked inside the car.

It is clear to the Court that John Rule had a personal privacy interest in the car sufficient to give him standing to challenge its search. The fact that the car had been left at the airport does not diminish that interest. Leaving a car in an airport parking lot is a commonplace occurrence for one going on a trip and does not constitute abandonment. The testimony of Trooper Spaulding was that King said on March 22 that Rule would be arriving in Maine within a day or two, and according to Agent Cunniff, the DEA checked Delta flights to see if he had reservations on any incoming planes. No other Defendant has asserted any type of privacy interest in Rule's car; therefore, no other Defendant has standing to challenge its search.

There is little information contained in the voluminous materials supporting the applications for the warrants that deals with Rule's car. Paragraph 6 of Cunniff's Fourth Supplemental Affidavit relates the circumstances of informant King's illicit drug runs. This paragraph describes King's being told to wait in the red Saab while Rule went to load King's car with marijuana. This information from King, however, must be disregarded since it is uncorroborated and the Magistrate was not able adequately to assess King's credibility. Corroborated information about the red Saab shows that King arrived in it with Rule at Sterner's New York apartment and that its license number was recorded by an employee who rented the Block cottage to Rule at a time when King said he was summoned there to pick up a load of marijuana.

Although the red Saab may have been used to transport Rule to the Block cottage in early March, there is nothing to indicate that the car was used to transport marijuana or to indicate that any evidence of the crime of conspiracy to possess marijuana would be found therein. Moreover, the warrant application seeks permission to search for marijuana, drug processing implements, and documents, including business records and phone books that might provide evidence of narcotics violations. The information provided by King, however, indicates that Rule hired others to transport marijuana rather than transporting it himself. It was unlikely, therefore, that marijuana would be found in his car. It was equally unlikely that drug processing equipment would be found in a Saab which is far too small for any significant level of drug processing operations to be carried on within it. Finally, a car is not the likely repository of business records and phone and address books. These would be more apt to be found in an office or perhaps the residence of a known drug dealer. There was, therefore, no probable cause to search the Rule automobile.

### D. The Search of the Cushner Cottage

At 1:30 a.m. the Magistrate issued warrants for nighttime searches of two houses in Naples. The search of the Cushner house disclosed a baggie of marijuana, drug paraphernalia, over $3000 in cash, and various documents and papers. Cushner seeks to suppress these items on the ground that there was no probable cause to search the house and also on the basis that the warrant contained an inadequate description of the premises to be searched.

Having viewed a photo of the Cushner house, Government Exhibit 10, the Court finds that the description of the house on the face of the warrant as a "brown stained pine clapboard single story chalet-style dwelling at the end of Brandy View Road in Naples, Maine" is not a misdescription of those premises. Although Agent Cunniff testified that the Cushner

house is located on Brandyview Drive, that minor discrepancy is not significant. Paragraph 7 of the supporting affidavit provides specific directions to the house based on the observations of officers who had surveilled the actions of Craig Sterner earlier in the day. These descriptions corroborated the description provided by informant King that was set forth in Paragraph 6 of the affidavit.

Defendant Cushner also argues that the directions provided by informant King do not lead to the Cushner house, but rather, to the Beckwith house, at which Sterner had stopped and which was discovered to contain marijuana. He contends, therefore, that the affidavit did not establish probable cause to search the Cushner house. The directions in paragraph 6 of the affidavit provide that the "chalet" is "located on a road approximately 1½ miles south of Naples, on the right when approaching Naples from Portland on Route 302. After bearing left, the house is on the right at the end of the road." Although the road to the Beckwith house is off to the right of Route 302, as discussed in footnote 11, *supra,* the Beckwith house cannot be described as a chalet, and it is not located at the end of a road. The Court finds that King intended to designate the Cushner house as the stash house and that his description of that house, as corroborated by the agents, was sufficient to describe it. Probable cause to believe that evidence of a crime might be found within the Cushner house is amply provided by the facts, independently corroborated or established, that the house had been identified by King as a stash house and that a car which the informant had said would pick up marijuana at the house in fact went to the house and was later found to contain marijuana.

Defendant Cushner also suggests that reasonable cause for issuance of a nighttime warrant was not provided to the Magistrate as required by Fed.R.Crim.P. 41(c)(1). The Court disagrees. As the affidavit states, the Cushner house had been secured since 7:30 p.m. The warrant was not issued until 1:30 a.m. As the Supreme Court stated recently in *Segura v. United States,* —— U.S. at ——, 104 S.Ct. at 3390, a seizure, including the securing of a building, which is reasonable at its inception "may become unreasonable as a result of its duration or other reasons." Even though the officers had the building secured, they could not keep it so forever while awaiting the warrant. In order to effect the least intrusion on Cushner's possessory interest in the seized house, it was imperative that the warrant be executed as soon as the application was completed.

Finally, Cushner argues that the evidence found in the house should be suppressed because it was initially found during a search which the Court has found to be unlawful. The facts in this case are similar to those in *Segura,* in which the Supreme Court declined to suppress evidence which had been seen and seized by officers who illegally entered an apartment while securing it. The reason given for not excluding the evidence as "fruit of the poisonous tree" was that there was an independent source for the warrant under which the evidence was seized.

> None of the information on which the warrant was secured was derived from or related in any way to the initial entry into petitioners' apartment; the information came from sources wholly unconnected with the entry and was known to agents well before the initial entry. No information obtained during the initial entry or occupation of the apartment was needed or used by the agents to secure the warrant.

*Id.* at 3391. The same situation obtains in this case. As was discussed previously, the officers had probable cause to secure the Cushner house. The information obtained during that procedure, details of the house's description and the information about Cushner's name and relationship to the house, were thus legally obtained and inject no infirmity into the warrant. Chronologically, the last bit of information related in the affidavit supporting the warrant is that Cushner arrived and told the securing officers that he was the occupant

of the house. No use was made of information gained during the illegal search of the house. As stated previously, the Magistrate's determination of probable cause to search was based on the information the DEA had gleaned about the Cushner house earlier in the day from the informant which was corroborated by their subsequent surveillance and stop of the Sterner car.

### E. The Search of the Cushner Truck

Supporting the application for the warrant to search the dark blue pickup truck driven by Robert Cushner on the evening of March 22, 1984, were Agent Cunniff's initial affidavit and second and third supplemental affidavits as well as Agent Steadman's supplemental affidavit. These affidavits stated that Defendant Robert Cushner arrived at his cottage late on the evening of March 22, 1984, driving a black Chevrolet pickup truck with Maine registration 73731F. Cushner identified himself as the renter of the house that had been designated a stash house by the DEA informant. Dennis Beckwith had told the officers that the marijuana in his house had been brought there by the dark-colored pickup truck with license number 73731F that Cushner had driven. That pickup truck was registered to the Long Lake Lobster Co. of Naples, Maine. At his bail hearing Cushner said that he worked for the Long Lake Lobster Co.

The facts set forth in the affidavits provide probable cause to believe that the blue chevrolet pickup with registration 73731F, registered to Long Lake Lobster Co., was an instrumentality of a crime and might, therefore, contain evidence of a crime. The slight variance in the color of the pickup described by Agent Steadman and that named in the warrant would not prevent the searching officer from knowing which truck was to be properly searched. Cushner's vehicle had been accurately described in other respects; it was impounded and had the same license number and registration as the truck described on the face of the warrant. It should be noted that the inclusion in Agent Stead-

man's affidavit of information regarding the baggie of marijuana found in Cushner's house does not affect the warrant to search the truck because of its initial discovery during the illegal entry of Cushner's house. As discussed previously, that evidence is not required to be suppressed because the warrant to search Cushner's house provided an independent, legal basis for discovery of the baggie of marijuana. Therefore, the search of the truck, which disclosed miscellaneous papers, was lawful.

### F. Beckwiths' House

As has been fully discussed above, there was no probable cause for securing or searching the Beckwith house and the entry and discovery of items in plain view was, therefore, unlawful. The warrant supporting the search of the Beckwiths' house had not and could not have had an independent source of information. Paragraph 11 of Agent Cunniff's affidavit describes the entry of the Beckwith house:

> When the officers asked if there were any weapons in the structure, Beckwith indicated there were. During a brief inspection of the structure for the officers' safety, they opened a trap door in the middle of the kitchen floor that led to living space in the basement. They saw a shotgun and smelled the odor of marijuana. Twenty to twenty-five bales of marijuana were covered by a tarpaulin.

This is the only part of the affidavit that could have provided probable cause for the Magistrate's issuance of the warrant. This information, all illegally obtained, irreparably tainted the warrant to search the Beckwith house. *See Segura v. United States*, — U.S. at —, 104 S.Ct. at 3390. It is plain that the only other mention of the Beckwiths or their house is found in paragraph 8, where Agent Cunniff states that Sterner's car drove from Cushner's house "to a small white structure located at box 321 Horace Files Road in Naples, Maine .... The Marquis remained at the shack a short time before it drove back to Portland." Sterner's sojourn at the Beckwith house may well have aroused

the curiosity of the officers and provided an impetus for further investigation. It did not, however, establish probable cause to believe that a crime had been committed there or that evidence of a crime would be discovered within. The items seized pursuant to the search warrant at the Beckwith house must, therefore, be suppressed from use against Dennis and Nancy Beckwith.

### ORDER

In accordance with the opinion herein, it is hereby ORDERED that:

(1) the statements of Daniel Quinn given to police before they had administered the *Miranda* warnings be, and are hereby, SUPPRESSED as the Defendant Quinn;

(2) The items found in both the warrantless and warrant searches of the Quinn car be, and are hereby, SUPPRESSED as to Defendant Quinn;

(3) the statements of Thomas Streifel given to police before they had administered the *Miranda* warnings be, and are hereby, SUPPRESSED as to Defendant Streifel;

(4) the items found during the booking search of Defendant Streifel and the items found during the inventory search of his car be, and are hereby, SUPPRESSED as to Defendant Streifel;

(5) the statements of Robert Cushner made before he was administered the *Miranda* warnings be, and are hereby, SUPPRESSED as to Defendant Cushner;

(6) the items found in both the warrantless and warrant searches of the Beckwith house be, and are hereby SUPPRESSED as to the Defendants Beckwith;

(7) the statements of Dennis Beckwith made on the night of March 22–23 after the illegal entry of his house be, and are hereby, SUPPRESSED as to Dennis Beckwith;

(8) the statements of Nancy Beckwith made on the night of March 22–23 after the illegal entry of her house be, and are hereby, SUPPRESSED as to Nancy Beckwith;

(9) The items found in the warrant search of the red Saab Turbo be, and are hereby, SUPPRESSED as to Defendant John Rule;

(10) In all other respects the Defendants' Motions to Suppress are hereby DENIED.

So ORDERED.

### ON MOTION FOR RECONSIDERATION

The Government has moved for reconsideration of the suppression order in this case, dated September 18, 1984. As a basis for such reconsideration the Government seeks an evidentiary hearing "to demonstrate that no material omission was intentionally or recklessly made."

At the outset the Court notes that the Government's request is too broad. Any determination to be made here can affect only the portion of the suppression order dealing with items seized under warrant from Defendant Rule's car. As the Court's initial opinion demonstrates, the material deleted from the affidavits as a sanction for the omissions the Government seeks to have reconsidered here did not affect in any way the Court's determinations that the warrant searches of the Beckwith house and the Quinn car were invalid. None of the informant's uncorroborated disclosures in any way concern the Beckwiths or their house or Quinn or his car. The Court, therefore, declines to reconsider its order on those matters.

In contrast, the invalidity of the warrant to search John Rule's car was occasioned by the lack of any showing that the car was related to Rule's alleged drug activities. The information deleted by the Court would have provided the requisite nexus between the car and conspiracy charged. The challenge raised by the Government, therefore, is properly directed only at that portion of the order which suppresses the fruits of the search of Defendant Rule's car.

■ The Court is unpersuaded by the arguments set forth in the Government's brief that a new evidentiary hearing is necessary and that the Court erred in its earlier assessment of the situation. One of the primary averments made in the affidavit submitted with this motion is that the responsible United States Attorney in subjective good faith did not believe that the information concerning King's double-dealing was relevant to the issue of probable cause. The Court was fully apprised of these subjective good-faith beliefs at the hearing and does not dispute them. The point the Court is trying to make, however, is that the *prosecutor may not* usurp the magistrate's function, and where the Court determines that such conduct has occurred, the effect of that conduct is not to be vitiated by the prosecutor's subjective good-faith state of mind. The subjective good faith of Government actors in the warrant process insulates an error in that process from the consequence of suppression only where the Government has provided the magistrate with that information properly necessary to the performance of his function and the error is that of the magistrate. *United States v. Leon,* — U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Neither of these criteria are satisfied in this case. Most significantly, the operative error here was that of the prosecutor in determining whether certain information was relevant to the magistrate's determination of probable cause. It was not any error of the magistrate that created the defect in the warrant. The defect arose, the Court found, from the magistrate's reliance upon uncorroborated information of the informant King. That occurred only because he was not aware of any question as to King's reliability. His lack of awareness of that factor was precipitated not by any error on his part but solely by the error of the prosecutor in deciding what he should be told in the application for the warrant.[1]

The role of the magistrate in the warrant process must be crystal clear to all those who participate in the criminal justice process. It is he who must look at the "totality of the circumstances" and make an informed neutral determination of whether probable cause exists. The prosecutor, as an officer of the court, is charged with presenting the facts upon which the magistrate can make that *informed* decision. The prosecutor is also charged with knowing the differnece between her role and that of the magistrate. By presenting an affidavit which does not, in fact, present the "totality of the circumstances" known to the prosecutor for the magistrate's informed, neutral decision, the prosecutor has *objectively* acted with reckless disregard for the truthfulness of the affidavit and also in a manner that is destructive of the integrity of the whole warrant process.[2]

---

1. The critical nature of the need for complete sanctity in the warrant process is now reinforced by a recent turn in legal doctrine. Under *United States v. Leon,* — U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), suppression of evidence is allowed in only the most restricted of circumstances where the seizure occurs in reliance upon a facially valid warrant. Thus, the preservation of Fourth Amendment values is left now almost entirely to the sanctity of the magisterial process in determining probable cause on an application for a warrant. It is, therefore, more important than ever that no opportunity, much less any encouragement, be given for substantial error to creep into that process by permitting the magistrate to be unknowingly deprived of available information that has a potentially significant bearing on his probable cause determination.

2. In the oral argument on this issue the following colloquy took place between the Court and the prosecutor:

 THE COURT: Why run the risk of not letting the Magistrate know what he [Cunniff] knew so he [the Magistrate] could be sure his judgment was right, so that a neutral and detached mind might share—

 MS. McGAUGHEY: And, your Honor, I have attempted to take the blame for that. I wish the Court to know that the decision to do that, I will inform the Court as an officer of the Court, was mine, not Mr. Cunniff's, and it was based on my evaluation that the credibility and the veracity of the witness was in no way impaired by what he had said; that the information about the eight trips was relevant as to my decision of whether to prosecute King.

 THE COURT: Was it your decision not to let the Magistrate know of that?

The Government's brief cites *United States v. Melvin*, 596 F.2d 492, 500 (1979). In that case the First Circuit found "not clearly erroneous" the trial court's factual determination that the *police* were merely negligent in not presenting in the affidavit an informant's subsequent recantation of his statement which had formed the basis for a finding of probable cause. The instant case is distinguishable from *Melvin*. In that case, the informant had been threatened and his recantation seemed to have been prompted by the threats and, therefore, to lack credibility. The First Circuit expressed grave concern for such an omission stating: "We do not approve the affidavit's failure to reveal the conversation; whether 'Arky's' recantation was unbelievable was properly for the issuing judge, not the police, to decide." *Id.* The Court found, however, that the conduct of the detective "was not so culpable as to warrant relief" because "his failure was evenhanded, omitting not only the extent to which 'Arky' had changed his story but the fact that he had received threats." *Id.*

In the instant case the omission was not that of a police officer, but rather of an officer of the court. Moreover, the evenhandedness found in *Melvin* was not present here. The drug runs by informant King were set forth in detail, reinforcing the impression that he was a knowledgeable, reliable informant. None of the information concerning the unauthorized nature of those trips and the response it elicited in the DEA agents was revealed. Therefore, the only information which might have cast doubt on the informant and his information was withheld while the information itself was presented.

The Government suggests that the Court, in reaching its conclusions concerning the omissions from the affidavits has not read the affidavits in a common-sense fashion. As the Court stated in its initial opinion, it is well aware of the generous spirit in which affidavits are to be read. Although its reading and rereading of the affidavits have been undertaken in that

vein, the Court cannot conclude, as the Government suggests, that the unauthorized nature of the informant's drug running was disclosed by the affidavits or that the status of the informant was clearly expressed.

The Government invites the Court to include in assessing the propriety of the magistrate's probable cause determination the material known to the Government and omitted from the affidavits and to make a fresh determination of the probable cause to search the automobile of Defendant Rule considering all the available information. Although insertion of the omitted material has been the remedial approach of many courts, including those cited by the Government, the Court does not find it appropriate here. *In order to reinforce the important function of the magistrate* as an informed, neutral decision-maker in the issuance of warrants, especially in view of the increased finality now given to those determinations, only those portions of the affidavits may stand in respect to which he was not deprived of the factual resources to perform that function by the conduct of the prosecutor. It was to achieve that purpose that the Court excised all portions of the affidavits which related activities of the informant which had not been in some way corroborated by the agents' other information or by their own observations.

Accordingly, it is ORDERED that the Government's Motion for Reconsideration and for an Evidentiary Hearing be, and is hereby, DENIED.

So ORDERED.