**STATE of Maine**

v.

**Jay G. THIBODEAU.**

Supreme Judicial Court of Maine.
Argued Jan. 9, 1985.
Reargued June 12, 1985.
Decided July 31, 1985.

Wayne S. Moss (orally), Charles K. Leadbetter, Michael N. Westcott, Anita M. St. Onge, Asst. Attys. Gen., Augusta, for the State.

Vafiades, Brountas & Kominsky, Jeffrey L. Hjelm (orally), Rudman & Winchell, Paul W. Chaiken, Bangor, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, VIOLETTE, WATHEN, GLASSMAN and SCOLNIK, JJ.

NICHOLS, Justice.

The Defendant, Jay G. Thibodeau, appeals from his conviction of murder, 17–A M.R.S.A. § 201(1)(A) (1983), following a jury trial in Superior Court, Penobscot County. He argues that the Superior Court erred in denying his motions: (1) to suppress certain statements that he made to investigating officers on three different occasions; and (2) to strike evidence concerning the test firing of the murder weapon. He further challenges the sufficiency of the evidence to support his conviction.

Because we conclude it was reversible error to deny the Defendant's motion to suppress the statements he made in the afternoon of October 28, 1983, we must vacate the judgment of conviction.

On October 30, 1983, a hunter found the body of John Tower, Jr., of Patten, near Shin Pond in that town; the body was partially covered by a piece of carpeting. Death was attributed to a bullet wound to the head and brain. A small caliber bullet, probably fired from at least a foot and a half, had entered behind the victim's right ear. A pool of blood and Tower's broken glasses were found next to each other approximately 17 feet from his body. A new spent casing, later confirmed to be one fired from a .22 caliber rifle that the Defendant had purchased on October 18 and traded on October 29 for another rifle, was found at the scene approximately 51 feet from the glasses in a direction towards the water. Subsequent test firings of the weapon had revealed that the maximum

distance a casing would be ejected was 13 feet and 9 inches.

Tower had been reported missing by his brother in the afternoon of October 27, 1983. That evening Trooper Ronald Graves, of the State Police, found Tower's automobile, a green 1973 Ford Galaxy, parked near Route I–95 in Sherman. A "for sale" sign rested on the seat of the vehicle. An investigation into the circumstances surrounding the abandoned vehicle and Tower's disappearance commenced the next morning, October 28. The victim's mother had informed Trooper Malcolm Dow, of the State Police, that the last time she saw her son was the day before when he had told her that he was taking a prospective buyer for his car on a test drive. She remembered seeing the prospective buyer and offered a description that proved to match that of the Defendant. She also that day noticed a gun lying on the concrete near the passenger's door of Tower's car as it was parked near her home. A neighbor of Tower's identified the Defendant as the person who was talking to Tower and holding a rifle.

Sergeant Schofield, Trooper Graves and Trooper Dow, of the State Police, went to the Thibodeau apartment at approximately 8:00 A.M. on October 28 to speak with the Defendant, then barely eighteen years old, concerning the information that had been collected. The officer's conversation with the Defendant, took place in a kitchen area, with the Defendant's parents both present, and lasted for five to ten minutes. During that time the Defendant declared that he had left his house to go hunting and had walked past the Tower residence when he noticed a "for sale" sign in Tower's automobile. He told the officers that he and Tower went for a test drive down the road, bought ten dollars worth of gasoline, and proceeded around the block where Thibodeau was dropped off at his home. He told them that Tower then drove away as the Defendant walked along Route 11 with his rifle, eventually going hunting on Happy Corner Road.

At approximately 3:15 P.M. of the same day came the critical confrontation. At that time Troopers Graves and Porter, of the State Police, returned to the Thibodeau residence. They asked the young Defendant to accompany them and show them the route he had taken the day before. Because by afternoon the officers had come to regard the Defendant as a prime suspect of foul play in Tower's disappearance, their ploy was to separate him from his parents. He had not been so regarded at the time of their brief conversation with him that morning. Nevertheless, no *Miranda* warnings were given.

When the youth complied with the officers' request and the three got into a two-door cruiser, they seated the young Defendant alone in the back of the vehicle. Instead of thereupon retracing the route taken on October 27, the asserted purpose of this second confrontation, once in the cruiser, he was driven to a side street where the two troopers talked with him for up to 40 minutes. In response to the officers' questions, the Defendant disclosed to them that: (1) he did not take his rifle with him during the test drive, but rather hid it across the street under a boat; (2) he and Tower drove down back roads; (3) he was dropped off at his parents' apartment at around noon; and (4) he went hunting until 4:00 P.M. or later and then had returned home. Only after this extensive questioning did the Defendant show the officers the route he claimed he had travelled. At one point during the drive he asked if he was a suspect; Trooper Porter responded that the Defendant was the last person to be seen with Tower. Thereupon the Defendant declared, "Well, I guess I am."

Four days later, Troopers Porter and Graves went to the Thibodeau residence at 9:30 A.M. to arrest the Defendant for the murder of John Tower, Jr. The officers did not possess an arrest warrant, but upon representing to the Defendant's mother and the Defendant that they were there to "talk to Jay and fingerprint him for elimination," the Defendant left with the offi-

cers and was placed in a cruiser; this time the officers read to him his *Miranda* rights. Upon arriving at the Houlton Police Department, the Defendant was taken to an interrogation room and asked if he wished to have a lawyer present. The Defendant responded that he was willing to proceed without a lawyer and gave a statement which was tantamount to a confession; this statement was recorded and subsequently played for the jury at his trial. In the recorded statement the Defendant stated that he left his house on October 27 at 9:30 or 9:45 A.M. to go hunting. His rifle was not loaded at the time. He had walked by Tower's car that was for sale and had stopped to talk with Tower for 15 to 20 minutes, prior to going on a test drive with him. The Defendant put his rifle on the back seat. They stopped for gas and eventually drove to Shin Pond. The Defendant pointed out his grandfather's camp and, when the Defendant thought they were leaving to go back to town, Tower drove toward the shore of the pond. The Defendant loaded his gun and went into the woods to look for birds. He returned to the car, put his loaded gun on the back seat, and walked to the water with Tower. They talked for a while about Tower's father who had been ill and, as they walked back to the car, Tower grabbed the Defendant's arm. The Defendant broke away and Tower ran after him. The Defendant rushed to the car, grabbed his gun, and shot Tower. The Defendant moved the body and drove away in Tower's car. After completing his oral confession, the Defendant provided a written confession, which encompassed essentially the same information as his oral statements, except that in writing the Defendant claimed that Tower walked after him rather than ran in pursuit.

A few days later the Defendant was indicted for murder, 17-A M.R.S.A. § 201(1)(A) (1983), and trial commenced on May 21, 1984. The taped and written confessions vary slightly from the Defendant's *testimony* at trial. The Defendant testified that he was scared when Tower grabbed him. His recollection was that Tower had started to follow him after the Defendant had retrieved his gun, but that Tower had stopped at the car door. It was at that point, the Defendant turned around and fired a shot. He testified, "I didn't even spot my gun, I just shot—I didn't sit there and aim at him. I just brought up the gun and shot." When he pulled the trigger, the butt of the rifle allegedly rested on his hip. The Defendant reiterated that he did not know why he shot Tower.

Upon appeal the Defendant asserts that his motions to suppress statements that he made to investigating officers in the morning and afternoon of October 28, 1983 should have been granted because, in both instances, he had been subjected by the State Police to a custodial interrogation without being given the *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A trial court's ruling on whether *Miranda* warnings were required because there had been a custodial interrogation "will be upheld if the record 'provides rational support for [the] determination.'" *State v. Longley*, 483 A.2d 725, 730 (Me.1984) *quoting State v. Bleyl*, 435 A.2d 1349, 1358 (Me. 1981). We have found that "[a] person is in custody for the purpose of *Miranda* only when he is deprived of his freedom in some significant way, or would be led, as a reasonable person, to believe he was not free to leave the presence of the police." *Bleyl*, 435 A.2d at 1358 (citations omitted); *see also United States v. Rule*, 594 F.Supp. 1223, 1234 (D.Me.1984) (whether a reasonable person in defendant's position would likewise have thought he was not free to go). The latter portion of our definition of "custody" is consistent with the United States Supreme Court's analysis of when a person has been "seized" within the meaning of the Fourth Amendment. *See United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). An interrogation refers "not only to express questioning, but also to any words or actions on the part of the police ... that

the police should know are reasonably likely to elicit an incriminating response from the suspect." *State v. Estes*, 418 A.2d 1108, 1111 (Me.1980) *quoting Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980).

In *State v. Cochran*, 425 A.2d 999, 1002 (Me.1981), we further provided the following criteria in determining whether there has been a custodial interrogation: (1) the locale where the statements were made; (2) the party initiating the contact; (3) the existence or non-existence of probable cause to arrest; (4) the subjective intent of the police; (5) the subjective belief of the defendant; and (6) the focus of the investigation.

■ Turning to the circumstances surrounding the morning conversation between the Defendant and the officers on October 28, we conclude that, even though the officers had received information that the Defendant had been speaking with the victim the day before and had a rifle in his possession, the officers were at that point conducting a *general investigation* of a missing person report. *See State v. Philbrick*, 436 A.2d 844, 849 (Me.1981). Accepting that it was indeed unusual, and perhaps a suspicious circumstance, that the victim had not returned home and that his car had been found abandoned, the police had no evidence at the time that he had been murdered.

Furthermore, the setting of this initial police contact with the Defendant was not one indicative of a custodial atmosphere. The Defendant was questioned in the kitchen of his own home with both of his parents present. The questions, lasting only five to ten minutes, focussed on the Defendant's contact with the victim and did not delve into the details of the Defendant's knowledge. Even in light of Trooper Graves' testimony at the motion hearing that the Defendant was "more than marginally a suspect," there was no evidence requiring a conclusion that the officers had probable cause to arrest the Defendant on the morning of October 28. Therefore,

clearly there was rational support for the motion justice's conclusion that the Defendant had not been subjected to a custodial interrogation in violation of *Miranda*.

■ The particulars of the afternoon confrontation between the Defendant and the officers differ significantly from those of the morning. At the motion hearing Trooper Graves testified that by the time the officers returned to the Thibodeau apartment he believed the Defendant had not been truthful in his morning account. Thus, the officer's suspicions had increased dramatically since the morning. He sensed that the victim was either dead or incapacitated in some way and that the Defendant was connected with the situation. His recollection was that the Defendant that morning had appeared nervous, holding his head down and avoiding eye contact with the officers. Graves felt that the Defendant was hiding something. The trooper conceded that by that afternoon the Defendant was the *only* suspect.

Accordingly, the officers' plans for questioning had been altered substantially. Their exploitation commenced when they implemented their decision to remove the Defendant from his home surroundings, including contact with his parents, for further interrogation. *See State v. Bleyl*, 435 A.2d 1349, 1358 (Me.1981). At the motion hearing the Defendant testified that he did not wish to go, but felt he had no choice. We conclude that under the circumstances at hand such a perception was one that would he held by a reasonable person. When the Defendant left with the officers he had no idea, or, for that matter, cause to suspect, that he would be driven down a side street and interrogated in a parked cruiser; he was asked *only* to show the officers the route he had taken the day before. Once he accompanied the officers the Defendant was never told that he was free to leave and, in order for him to have left the cruiser, an officer in the front would have had to open one of the doors and pull his seat forward. Similarly, in the hour and a half that the Defendant was

with the officers in this police-dominated atmosphere,[1] he was never asked if he wished to take a break or return home. The combination of these factors amounted to a custodial setting. He was then and there deprived of his freedom in a significant way. Moreover, armed with what they then knew, the officers had ample grounds to anticipate that the Defendant's responses in the afternoon interrogation would prove incriminating. Even in light of the appropriate deference we accord to motion justices' determinations, *Miranda* warnings clearly should have been given to this young man.

To describe the afternoon questioning as merely an elaboration of the morning's account would be wholly inaccurate. Significantly, as the State conceded at oral argument, the Defendant's statements were strategically used by the State to impeach the Defendant's credibility at trial by providing examples of the number of ways in which the Defendant had changed his story. The distances of the routes that the Defendant claimed to have taken, both with the victim and when alone hunting, prompted the officers to ask again what time he had returned home on October 27. The officers commented to the Defendant that he had walked farther than the ordinary person could in such a time span. In response, the Defendant changed the time he originally purported from 4:00 or 4:30 to 6:30 P.M. Although admittedly intended by the Defendant to be exculpatory, those statements, later proving to be blatantly incriminating, were made during a custodial interrogation without the giving of *Miranda* warnings.

In sum, such evidence at the hearing on the motions compels a conclusion that evidence of the afternoon confrontation should have been suppressed.

Moving on to the next issue, the Defendant argues that his written and oral confessions, along with other evidence obtained on the day of his arrest, were not given voluntarily and were the products of an illegal arrest. A finding of an illegal arrest will not necessarily preclude subsequent statements from admission into evidence. *See State v. Bleyl*, 435 A.2d 1349, 1360 (Me.1981); *Brown v. Illinois*, 422 U.S. 590, 601–602, 95 S.Ct. 2254, 2260–2261, 45 L.Ed.2d 416, 426 (1975). In the case before us we need not scrutinize the alleged illegality of the arrest, because we identify no causal connection between the circumstances directly surrounding the arrest and the Defendant's subsequent statements.[2] In *Bleyl*, we set forth the following factors in determining whether statements made after an illegal arrest are admissible: (1) the voluntariness of the statements; (2) whether *Miranda* warnings were given; (3) the time span between the arrest and the statements; (4) the existence of intervening circumstances; and (5) the nature of the police misconduct. 435 A.2d at 1360 (citations omitted).

"Voluntariness" concerns not only the specific actions of the police, but also the mental and physical condition of the defendant. *State v. Caouette*, 446 A.2d 1120, 1123 (Me.1982). Article I, Section 6, of the Maine Constitution, places upon the State the burden of proving voluntariness beyond a reasonable doubt. *Id.* at 1122; *see also State v. Collins*, 297 A.2d 620, 626 n. 5 (Me.1972). Although it is indeed evident from listening to the recorded confession that the Defendant was upset, we find

---

1. *See State v. Preston*, 411 A.2d 402, 405 (Me. 1980) (coercive nature of the interrogation found to be enhanced when it was conducted in a police car).

2. In the record we find conflicting accounts on whether the officers' misrepresentation that they were at the Defendant's residence to take *him* "to be fingerprinted for elimination" was made before or after gaining physical entry.

*See Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639, 653 (1980) (a warrantless, nonconsensual entry into a person's home in order to effect an arrest, in the absence of exigent circumstances, violates the Fourth Amendment). The State did not contend that the exigent circumstances exception was applicable; both parties focussed on whether proper consent was given.

adequate support for concluding that the Defendant spoke from the free choice of a rational mind. *See State v. Mikulewicz*, 462 A.2d 497 (Me.1983). The Defendant testified at the motion hearing that he understood his rights, knew what he was saying and writing, and did not feel threatened or coerced by the officers.

The situation in the case at bar stands in sharp contrast to the defendant's failure in *Caouette* to remember even the events following his arrest. This Defendant appears to have had a vivid recollection of everything that transpired. In addition, the officers gave the Defendant the *Miranda* warnings several times and inquired whether he understood his rights to remain silent and to have an attorney present. The Defendant explicitly acknowledged his understanding and even repeated his rights to the officers. Over an hour passed from when the Defendant was taken from his home and when he confessed. He testified that he knew that the officers would be back for him and that they were there for that purpose on November 1. Seemingly, the Defendant was not taken by surprise when he was arrested; the fact that there was a misrepresentation used in effectuating the arrest, a ruse which we do not condone, did not appear to influence the Defendant's state of mind. We find no error in denying his motion to suppress the statements he made on the day of his arrest.

■ The Defendant next contends that the Superior Court erred in denying his motion to strike evidence concerning the test firing of the murder weapon. He claims unfair surprise as a result of a discovery violation that was disclosed in testimony regarding the distances that shell casings were ejected. When it is determined that the State has failed to comply with the discovery requirements of M.R. Crim.P. 16(b)(2)(B),[3] the presiding justice has broad discretion under M.R.Crim.P. 16(d)[4] in deciding what, if any, sanctions are necessary to protect the defendant from unfair prejudice. *State v. Mylon*, 462 A.2d 1184, 1186 (Me.1983) (citations omitted). In the instant case, the Defendant was informed during discovery that the murder weapon, when tested, ejected a shell casing a distance of 13 feet and 9 inches. At trial, Trooper Gallant testified that he had fired the weapon 20 or 25 times with the *maximum* ejection distance being 13 feet and 9 inches. While we agree with the Defendant that the State's statement during discovery was somewhat misleading in that it implied only one test firing, we discern no real prejudice resulting from the evidence that was admitted, but not divulged during discovery. The Defendant at no time made a motion for a continuance or otherwise expressed a desire for additional time to procure his own tests. Finding no abuse of discretion in the Superior Court's denial of the motion to strike, we do not now provide a remedy for the Defendant's failure to test the weapon.

Finally, upon a careful review of the record, we find no merit in the Defendant's argument that there was insufficient evidence to support his conviction.

The entry is:

Judgment vacated.

3. Rule 16(b)(2)(B) provides:
   **(b) Discovery Upon Request.**

   .    .    .    .    .

   (2) *Scope of Discovery*. The following matters are discoverable:

   .    .    .    .    .

   (B) Any reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons.

4. Rule 16(d) provides:

If the attorney for the State fails to comply with this rule, the court on motion of the defendant or on its own motion may take appropriate action, which may include, but is not limited to, one or more of the following: requiring the attorney for the State to comply, granting the defendant additional time or a continuance, relieving the defendant from making a disclosure required by Rule 16A, prohibiting the attorney for the State from introducing specified evidence and dismissing charges with prejudice.

Remanded for further proceedings consistent with the opinion herein.

VIOLETTE, GLASSMAN and SCOLNIK, JJ., concurring.

WATHEN, Justice, with whom McKUSICK, Chief Justice, and ROBERTS, Justice, join dissenting.

I must respectfully dissent. I disagree with the holding of the Court that the statement obtained from defendant during the afternoon of October 28, resulted from a custodial interrogation. The Superior Court found no custodial interrogation. This Court now adopts a contrary view of the facts and departs totally from the usual standard of review requiring clear error to reverse a finding of the trial court.

The Superior Court was required to find as fact whether defendant was "deprived of his freedom in some significant way, or would be led, as a reasonable person, to believe he was not free to leave the presence of the police." *State v. Bleyl*, 435 A.2d 1349, 1358 (Me.1981). The Court found as follows:

> Further, the circumstances did not constitute custodial interrogation. Thibodeau cooperated with the detectives in generally non-coercive settings. Neither his situation in the cruiser nor the suspicions of the police reached a level requiring a statement of Thibodeau's 'rights.'

The ruling of the trial court should be upheld if the record provides rational support for its determination. *State v. Longley*, 483 A.2d 725, 730 (Me.1984).

This Court concludes that although the interview conducted on the morning of October 28 amounted only to a general investigation of a missing person report, as a matter of law, the afternoon interview rose to the level of a custodial interrogation. An examination of the record reveals that the information known to the police before the morning interview was as follows: On October 27, Tower's relatives reported him as missing. During the evening of the 27th, officers located his unattended vehicle. Numerous witnesses confirmed that defendant was the last person to be seen with Tower. When the officers conducted the afternoon interview they had no information in addition to that which they had in the morning. One of the investigating officers described the state of the investigation as it existed at the conclusion of the afternoon interview, in the following terms:

> There was no crime. There was an individual who out of his normal routine of life had changed, and at that point we did not know whether perhaps Mr. Tower had a medical problem or just what. We did not know.

Neither in the morning, nor in the afternoon, did the officers have any information concerning the whereabouts of Mr. Tower or the state of his health.

Throughout the entire investigation the police were understandably concerned about the possibility that Tower might be dead or incapacitated. The majority characterizes the afternoon interview as a ploy and an exploitation. The evidence, however, contains only the following account of the officer's purpose in returning to the Thibodeau residence:

> Purpose was to go and to determine what Mr. Tower might have done after he left Mr. Thibodeau, perhaps there was conversation that would have suggested what his intentions were to do the rest of the day, general information in regards to Mr. Tower, and the route of travel they took and anything that might have happened to interrupt Mr. Tower's intention of what he planned to do the rest of the day.

On both occasions when defendant was interviewed on October 28, the police were investigating a report of a missing person and had no evidence that Mr. Tower had been murdered.

In spite of the absence of any change in the information known to the police, this Court constructs an elaborate transformation of the attendant circumstances and finds that a legally significant change occurred between the morning and afternoon

of October 28. From the record the Court gleans four circumstances and concludes that the cumulative effect of these circumstances is to produce a "custodial setting." The circumstances noted are as follows: (1) the officers suspicions had increased by the afternoon and the plans for questioning had been altered; (2) defendant testified he did not wish to go with the officers but felt he had no choice; (3) defendant remained in the car for an hour and a half and was never told that he was free to leave nor was he asked if he wished to take a break; and (4) defendant was seated in the back seat of a two-door unmarked cruiser. The Court's analysis fails to demonstrate that the evidence compels a result contrary to that reached by the Superior Court. Indeed, the analysis includes conclusions that are contradicted, rather than compelled, by the evidence. In my judgment the Court has usurped the function of the factfinder and has failed to state a basis for reversal. In order to reverse the Superior Court, we must find that the evidence *compels* a contrary result.

The first two circumstances noted, should not be considered on appeal. The Superior Court did not find that the officers suspicions had increased by the afternoon. In fact the principal investigating officer acknowledged on cross-examination that before the morning interview, defendant was the "only possible suspect" in the sense that "he was the last person we knew of at that time that would have been with Tower." The record contains no evidence of any subsequent change in the nature of the officer's suspicion or the basis for his suspicion.[1] Beyond the factual accuracy of the Court's assumption, the United States Supreme Court has explicitly rejected the notion that *Miranda* warnings are required simply "because the ques-

tioned person is one whom the police suspect", even when the questioning takes place in the station house. *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). Similarly, an interrogation is not custodial merely because the police interviewed a person who was the "focus" of a criminal investigation. *See California v. Beheler*, 463 U.S. 1121, 1124, 103 S.Ct. 3517, 3519 n. 2, 77 L.Ed.2d 1275 (1983); *Beckwith v. United States*, 425 U.S. 341, 347, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976). With regard to the second circumstance, the hearing justice was not required to accept, and did not accept, defendant's conclusory testimony that he felt he had no choice but to go with the officers. It is beyond dispute that the factfinder is free to reject evidence. Further strength is added to the hearing justice's conclusion by the fact that defendant testified at the suppression hearing and acknowledged that his purpose in accompanying the officers was "to keep them off [his] track."

In assessing the effect of defendant's presence in the police cruiser, this Court appears to be troubled by the duration of the interrogation and the fact that defendant was never expressly advised that he was free to leave. The Court assumes that a lengthy interrogation was conducted and that defendant was not even offered a break. The record does not support this version of the events. When the officers' approached defendant in the afternoon they "asked Jay if he would go with us and show us where he had gone with Mr. Tower and what he himself had done for the previous day." After getting into the car they stopped to permit one officer to take notes while defendant repeated what he had told the officers during the morning conversation. The estimated time of that

---

1. The Court's opinion refers to defendant's statement to the officers that he assumed he was a suspect. Because this statement appears only in the transcript of the trial testimony and does not appear in the record of the suppression hearing, it has no bearing on the denial of the suppression motion. The officers never told defendant that they considered him to be a suspect nor did they question his truthfulness until after the afternoon interview was completed. Only at that point did they suggest that the distance he claimed to travel on foot was inconsistent with his arrival time.

stop varies from 15 to 30 minutes. The officer's testimonial summary of defendant's statement consumes five solid pages of typed transcript. After listening to defendant repeat his earlier statement concerning the route he followed on the prior day, the three retraced the complicated route he outlined. The subsequent events were described by one of the officers as follows:

A. We drove out from where we were parked, which was within sight of Route 159, also called the Houlton Road. We drove out to that intersection and took a left toward Island Falls, and we drove past the Tower residence, which is situated on that highway, on by the Department of Transportation garage, continued on to the intersection of the Hat Farm Road. We drove to the end of that road. There were some boulders across the roadway there. At this point, Mr. Thibodeau indicated that they were there the day that he walked in there hunting. We turned around there, and we drove back to the intersection of 159. He then directed us back towards Patten indicating he walked on the left going back towards Patten, on the right coming toward Island Falls, so it was the same side of the highway. We drove back to the Tower residence. Here he said he was where they started driving the vehicle. He took us up to the stop sign, which is adjacent to the Chevron station, Carver's Chevron station. We then took a right up Main Street. He indicated at this point that they drove just up as far as the cemetery, that Mr. Tower turned into the cemetery, backed out, and then drove back downtown, and he was dropped off in front of the apartment. There was no indication at that time by Mr. Thibodeau that they drove on any of the back streets of Patten.

Q. Okay. did he then—did you trace his hunting route with him, where he went after he was dropped off by Mr. Tower?

A. We did. He indicated after getting out of the vehicle, walked up back to Pat's Pizza and then back down over the hill, which we drove down Mill Street to the housing development where his grandfather lives. We drove into the housing development that time, and he showed us which house it was that his grandfather lived in. He showed us the fence that he jumped over when he deposited the gun behind the house. We turned around and went back the same route, down Mill Street to the junction of Route 11. We turned left, went south on Route 11 a number of miles to the junction of Route 11 and the Happy Corner Road. We turned right onto the Happy Corner Road and drove up that road to the junction of the Frenchville Road, turned right onto the Frenchville Road, went in there a couple of miles or so to this house he pointed out. It was burnt. I think it had a grayish trim. I'm not sure of the color. We were going to drive out back a little bit, but it was pretty rough going. He said he hunted out behind that house for about 20 minutes. Then we turned around and drove back the same route until we came to the Charles Kinney residence. As we had passed it previously, he had indicated, as he walked along this road, which by the way was the only time he'd ever walked this route, that there were some men working on an old pickup there. So we pulled into the driveway, and Trooper Graves went inside and conducted an interview of the people there.

Q. That's with Mr. Kinney?

A. I believe so, yes.

Q. So approximately how long had you stopped at the Kinney residence?

A. I don't believe we was there over ten minutes.

Q. And where was Mr. Thibodeau during this time?

A. Mr. Thibodeau was still seated in the back of Mr. Graves' vehicle.

Q. And when Mr. Graves came back into the vehicle, was anything said that you can recall of what his interview had been about or uncovered or anything?

A. No, there was nothing said at that time.

Q. So when Mr. Graves got back in the car and all of you were in the car, what occurred next?

A. We backed out onto the highway and drove into Patten where he was dropped off at his apartment—Mr. Thibodeau.

In my opinion the evidence satisfactorily accounts for the duration of the meeting between defendant and the officers.[2] It does not support the conclusion that there was a one and one half hour interrogation. It is true that the officers never expressly told defendant that he was free to leave, however, there is no authority, and the Court cites none, for the proposition that a *Miranda* warning is mandated by the failure of the police to expressly advise a person that he is free to leave.

In the final analysis we are left with the unchallenged fact that defendant seated himself in the rear seat of a two-door, unmarked car while in the company of two plain-clothes officers. In two cases that present far more compelling circumstances than the present case, the United States Supreme Court has summarily held that *Miranda* warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977); *see also California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983). The Supreme Court has clearly held that the ultimate inquiry in a case such as this is "simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. at 1125, 103 S.Ct. at 3520. Further, in remarks which apply directly to this Court's opinion, the Supreme Court has stated, "[s]uch a noncustodial situation is not converted to one in which *Miranda* applies simply because a review-ing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.'" *Oregon v. Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714. In a manner consistent with the Supreme Court decisions, we have previously held that the *Miranda* rule is not necessarily implicated by the fact that a defendant's conversation takes place in a police cruiser. *State v. Lewis,* 373 A.2d 603, 607 (Me.1977). I decline to adopt a different rule solely because the defendant happens to sit in the rear of the car rather than the front. The impairment in defendant's freedom of movement resulting from his location in the back seat, does not rise to the "degree associated with a formal arrest."

The record rationally supports the ruling of the hearing justice. The afternoon interview was merely a continuation of the interview conducted at defendant's home in the morning. Defendant did not ask to leave the car at any point. In fact, in an effort to lead the officers astray, he eagerly participated in showing the officers the route he claimed he followed on the day in question. The afternoon interrogation was neither prolonged nor accusatory in nature. Surely, the presiding Justice committed no error in concluding that defendant was not restrained in his freedom of movement to the degree associated with a formal arrest.

I would affirm the conviction.

---

**2.** The only suggestion of the actual distances involved is the officers testimony that the route

defendant claimed to walk while hunting was 14 miles.