STATE OF MAINE
CUMBERLAND, ss.

UNIFIED CRIMINAL DOCKET
PORTLAND
CUMCD-CR-16-6527

STATE OF MAINE  )
                )
                )
v.              )
                )
CLIFFORD RICHARDSON )
                )

FEB 7 AM10:45

MOTION TO SUPPRESS

**NOW COMES** Defendant, Mr. Clifford Richardson, by and through counsel Devens M. Hamlen of The H&H LawCenter, and requests that this Honorable Court suppress any statements Mr. Richardson made during the custodial interrogation in Officer Phillip Jones's cruiser as well as at the Bridgton Police Department because those statements were obtained in violation of Mr. Morse's rights under Article 1, Sections 6 and 6-A of the Maine State Constitution and Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

As grounds for this Motion, Mr. Richardson respectfully states:

## FACTS

1.      The State had charged Mr. Morse with one Class B Felony of Unlawful Sexual Contact and one Class D Misdemeanor of Unlawful Sexual Touching.

2.      According to discovery provided by the State, the following events, relative to this Motion, happened between October 1 and October 31, 2016:

3.      On October 31, 2016, Officer Phillip Jones went to the Richardson's house to talk to Richardson's about allegations made by K.D. Officer Jones told Mr.

Richardson that he was not under arrest and they agreed to talk inside Mr. Richardson's home. Mrs. Richardson along with the Richardson's daughter and grandchildren were present in the home. There were also a number of the Richardson's dogs in the house.

4. Officer Jones explained that he was "used" to people being nervous and that, due to "distractions" is was sometimes "easier" to talk alone with individuals. Officer Jones asked to talk to Mr. Richardson outside and alone.

5. Once outside, Officer Jones asked Mr. Richardson why he thought the police were at the house. Mr. Richardson explained that he had received some text message regarding K.D.s allegations; he emphatically denied having any sexual contact with K.D.

6. Officer Jones indicated in his police report that at that point, he offered to talk to Mr. Richardson in his cruiser because it started to rain. He also reports that he again told Mr. Richardson that he was not under arrest.

7. However, the recorded interview does not comport with this report. In the recording, Mr. Richardson again emphasized that he felt very nervous. More specifically, as Mr. Richardson is explaining the Richardson's relationship with K.D. he states:

> Mr. Richardson: From what I understand, she's had a pretty rough time at home with neglect . . . not . . . (eh) don't get me wrong . . . she's not . . . not in a way that she's in harm.
>
> Officer Jones: Right . . .
>
> Mr. Richardson: I mean . . . What I . . . I'm sorry, I'm so nervous
>
> Officer Jones: Have a seat . . .come over here . . . you're not in trouble but let's just sit and relax a little bit.

At that point, Mr. Richardson and Officer Jones got into the police cruiser.

8. Officer Jones begins by asking about the babysitting arrangements with K.D., how often she was over at the house, and how the Richardson's viewed and treated K.D. Mr. Richardson explained that he and his wife basically treated K.D. as a their own grandchild and treated her with love because they felt as if she was not getting loved at home.

9. As the interview goes on, Officer Jones talked about people being nervous when he interviews them. About a third of the way through the interview, Mr. Richardson tells Officer Jones that he is "scared to death." Officer Jones tells Mr. Richardson that if he did nothing wrong, "there is nothing to worry about."

10. Officer Jones explained to Mr. Richardson that there was a forensic interview with K.D. He goes on to say that some of K.D.s clothes were analyzed (it is unclear by who) for mitochondrial DNA. He explained that skin cells go everywhere.

11. He then touched the dashboard of his cruiser and suggested that his (Officer Jones's) DNA was now on the dashboard. Officer Jones goes on to explain how the State, forensically, can find someone's DNA on clothing, outside of underpants or even inside underpants. He concludes this part of the interview by telling Mr. Richardson that he had reviewed all of the reports before he came to his house. As it turns out, the State never tested K.D.'s clothing for DNA nor were there any reports regarding DNA.

12. Officer Jones then explains how important it was for Mr. Richardson to tell the truth and that he knew most of the answers to the questions he was asking; he also explains that he saw some inconsistencies between his investigation and what Mr.

Richardson was saying. Mr. Richardson continued to deny that any sexual contact had occurred.

13. Towards the end of the interview, Officer Jones states that Mr. Richardson's denials were getting harder to believe. The interview goes on as follows:

> Mr. Richardson: So, I'm going to jail
>
> Officer Jones: No, I didn't say that . . . If I thought that you needed to go to jail right now, I'd grab my handcuffs, put them on you, and we'd drive to jail.

14. Officer Jones then explains that he wanted to get to the truth and wanted an open an honest conversation and once that happens "we can think about our options." He tells Mr. Richardson that the "lie is worst part." Mr. Richardson again denies doing anything to K.D.

15. They then discuss K.D. wearing a dress the last time she was over at the house. Mr. Richardson explains at one point, K.D.'s dress accidently went up and he pulled her dress down. He explains that any contact was inadvertent as he pulled her dress back down. They then have a discussion about pornography. Mr. Richardson emphatically denies showing any pornography to K.D. As Officer Jones continues to express disbelief in Mr. Richardson's statements, Mr. Richardson says, in resignation, "o.k., I'm sunk."

16. After some more strong denials, Officer Jones appears to change tactics. He explains to Mr. Richardson that, after interviews such as this one, people tend to go far away or are so depressed that they hurt themselves. Mr. Richardson responds that he has nothing to hide and that he has no intention of hurting himself.

17. Sensing that Officer Jones was referring to jailing Mr. Richardson, Mr. Richardson responds by saying, "but what you are saying is that I am looking at jail time." The interview continues as follows:

> Officer Jones: No, I'm not saying that. I'm saying that people that are gettin' (sic) investigated because of an allegation often times get very worried.
>
> Mr. Richardson: I am . . . I am worried like you wouldn't believe. . . I am scared to death. I've heard what happens to people who go to prison.
>
> Officer Jones: But did you do anything wrong?
>
> Mr. Richardson: No, I didn't.
>
> Officer Jones: Then if you did nothing wrong, you have nothing to worry about.
>
> Mr. Richardson: But you are telling me I did.
>
> Officer Jones: I'm tell you that I have a very clear statement from a young lady that says there was misconduct. And I am telling you there is . . . there are levels of evidence that are being analyzed. And I am telling you that if there is any actual crime here, we are going to find that crime and we are going to find it out. And the person who committed that crime is going to be held accountable.
>
> That will happen.
>
> Now if that person who committed that crime is going to deny, deny, deny deny until the final say, that I don't know what the sentencing will be. Normally if someone is open and honest about whatever they have done then we seek to try to help that person with treatment. We seek to help that person in the best way we can to preserve quality of life.
>
> My biggest question for you is have you been honest with me. If you have not been honest with me then you have something serious to worry about. If you have not been honest with me, now is the time to be honest with me.
>
> People that lie to me investigatin' (sic) . . . investigations like this I do lock up and throw away the key. That does happen. People that are open and honest, I try to make recommendations to the district

attorney, I try to do everything I can to help that justice be served but assist quality of life.

I'm not making any promises but I am saying if you lie to me Cliff, if you lie to me, we will find out and we do take extreme sentencing measures when lying happens.

So, as long as you can sit here with me right now with your conscience clear that you have told me the truth. And if you have not, then now is the time, because when we step out of this car, I've taken your statement.

18.    At that point, over an hour and 30 minutes into the interview and after multiple denials, Mr. Richardson admits to touching K.D.'s vagina one time. The police then arrested Mr. Richardson, brought him to the station, administered Miranda, and obtained a similar confession.[1]

## LEGAL ARGUMENT

### A) Initial, Un-*Mirandized* Statements

19.    Article I, Section 6 of the Maine Constitution as well as the 5th Amendment of the United States Constitution guarantees that the State cannot compel an individual to incriminate themselves. Miranda v. Arizona, 384 U.S. 436 (1966); Missouri v. Seibert, 542 U.S. 600 (2004); State v. Nightingale, 2012 ME 132. Under Article 1, Section 6-A, the Maine Supreme Court (herein referred to as the Law Court) has held that the Maine Constitution provides greater protections than its federal counterpart, especially with respect to confessions and self-incrimination. See State v. Hunt, 2016 ME 172; State v.

---

[1] It should be noted that Mr. Richardson has yet to review the actual audio of the second interrogation, therefore, he reserves the right to make additional arguments once he has had a chance to listen to and review the second interrogation.

Collins, 297 A.2d 620, 626-627 (Me. 1972)(rejecting the federal preponderance of evidence standard with respect to confessions and declaring that the Maine Constitution required that the State prove a confession voluntary beyond a reasonable doubt)).

20. "In order for statements made prior to a *Miranda* warning to be admissible, the State must prove, by a preponderance of evidence, that the statements were made while the person was not in custody, or was not subject to interrogation." State v. Hassen, 2007 ME 77, ¶ 1. In other words, the State is required to provide *Miranda* warnings prior to a custodial interrogation. Id. Thus, "the United States Supreme Court held that the prosecution may not use statements, either exculpatory or inculpatory, resulting from custodial interrogation of a defendant 'unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.'" State v. Smith, 612 A.2d 231, 233 (Me. 1992)(quoting Miranda, 384 U.S. at 444)).

### I) Mr. Richardson was in Custody

21. "A defendant is 'in custody' if subject to either: (a) a formal arrest; or (b) a 'restraint on freedom of movement [to] the degree associated with a formal arrest.'" State v. Michaud, 1998 ME 251, ¶ 4 (quoting Stansbury v. California, 511 U.S. 318, 322 (1994)); State v. Thibodeau, 496 A.2d 635 (Me. 1985). The Law Court has laid out a number of objective factors when it decides whether an individual is in custody and will examine the totality of circumstances. Michaud at ¶ 4.

22. Mr. Richardson was in custody when Officer Jones interviewed him in his police cruiser. See Thibodeau; but see State v. Williams, 2011 ME 36 (holding that, based upon the totality of circumstances, Mr. Williams was not in custody when the police interviewed him in the front seat of the cruiser). Officer Jones initiated the

interview and took Mr. Richardson from the comfort of his home and the support of his family and had him sit in the front seat of his cruiser. While it is true they were still in his driveway (Thibodeau) and, for most of the interview, Officer Jones took a friendly tone (Thibodeau), Mr. Richardson is an older man of somewhat limited mental abilities who has never had any interactions with the police.

23. Mr. Richardson was also clearly nervous. Officer Jones mentioned, offhandedly, that no one was in trouble. However, once they got to the cruiser, he never specifically mentioned that Mr. Richardson was not under arrest and he never told Mr. Richardson that he was free to leave.

24. Further, as the interview went on, it was clear to Mr. Richardson, by his repeated concerns about going to jail, that knew he was the focus of the investigation. As the Law Court has stated "[t]he court can consider, as it did here, the suspect's awareness of the State's knowledge of circumstances tending to incriminate the suspect in the commission of the crime so long as the reasonableness of the belief that one is in custody is measured against that of a reasonable person innocent of any crime." State v. Hewes, 558 A.2d 696, 699 (Me. 1989).

25. Therefore, under the totality of circumstances, Mr. Richardson was in custody at the time Officer Jones questioned him.

II) The Police Interrogated Mr. Richardson and Mr. Richardson Made Incriminating Statements

26. While voluntary statements do not implicate Miranda, "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating

response from the suspect." Smith, 612 A.2d at 233. Routine booking questions, questions which the police ask to clarify a situation, and volunteered statements are not subject to *Miranda* protections. See Miranda at 478; State v. Griffin, 2003 ME 13; State v. Dominique, 2008 ME 180. An admission can be "[a]ny statement by a defendant in a criminal case which, in conjunction with proof of other facts and circumstances, tends to prove guilt . . ." State v. Jones, 405 A.2d 149, 151 (Me. 1979).

27.     Officer Jones went to the Richardson's house to specifically question Mr. Richardson about K.D.'s allegations. Without advising Mr. Richardson of his *Miranda* rights, Officer Jones asked a multitude of questions that were likely to elicit an incriminating response from Mr. Richardson.

28.     Therefore, because Mr. Richardson's statements were taken in violation of *Miranda*, the State cannot use them in trial to prove Mr. Richardson's guilt. Dominique, 2008 ME 180 at ¶ 9.

III) Mr. Richardson's Statements Were Not Voluntary

29.     Even if this Court does not find that the police violated Mr. Richardson's *Miranda* rights, because the State compelled an involuntary confession, pursuant to Article 1, Section 6-A of the Maine State Constitution as well as the due process clause of the Fourteenth Amendment of the United States Constitution, this Court must exclude Mr. Richardson's confession. See generally State v. Hunt, 2016 ME 172.

30.     Time and time again, the Law Court has reiterated the special protections the Maine Constitution gives its residents, especially with respect to involuntary confessions. See generally State v. Collins, 297 A.2d 620 (Me. 1972); State v. Wiley, 2013 ME 30; Hunt, 2016 ME 172. As explained in Collins and reiterated most recently in

Hunt, "public policy and 'the values we find at stake' – namely, safeguarding 'the right of an individual, entirely apart from his guilt or innocence, not be compelled to condemn himself by his own utterances' – demand that, in Maine, the State must prove voluntariness beyond a reasonable doubt.'" Hunt at ¶18, n. 4 (quoting Collins at 626-27).

31.     In order to determine whether the State unconstitutionally compelled a confession this Court must examine "'whether the State has obtained the confession in a manner that comports with due process.'" Hunt at ¶ 19 (quoting, State v. Rees, 2000 ME ¶¶ 35, 36. "'The Due Process Clause . . . prohibits deprivations of life, liberty, or property without fundamental fairness through the governmental conduct that offends the community's sense of justice, decency, and fair play.'" Id. (quoting, State v. McConkie, 2000 ME 158, ¶ 9). Through this rubric of fundamental fairness, the Law Court, under a "totality of circumstances" test, examines whether a defendant's statements were free and voluntary. Id.

32.     More specifically the Law Court has held that:

> [T]he voluntariness requirement gives effect to three overlapping but conceptually distinct values: (1) it discourages objectionable police practices; (2) it protects the mental freedom of the individual; and (3) it preserves the quality of fundamental fairness in the criminal justice system.

Id. at ¶ 20 (citing, State v. Mikulewicz, 462 A.2d 497, 500 (Me. 1983). Thus, the Hunt Court reiterated "that a confession is involuntary when it is made under circumstances that offend one of these fundamental values of social policy and constitutional law. Id.

33.     Among other circumstances the Law Court examines when determining whether a confession is voluntary, the Court has spent time focusing on "police trickery"

and times when the police make "threats, promises or inducements" in order to compell a confession. State v. George, 2012 ME 64, ¶ 21; see e.g. State v. Tardiff, 374 A.2d 598 (Me. 1977); State v. Gould, 2012 ME 60; State v. Lavoie, 2010 ME 76; State v. Nadeau, 2010 ME 71; State v. Dion, 2007 ME 87; State v. Theriault, 425 A.2d 986 (Me. 1981). The Law Court, in the majority of these cases, focused on somewhat vague police statements that suggested things would be better if the defendant confessed and/or told the truth. Nadeau at ¶ 57; Dion at ¶ 34; Theriault at 990.

34.     However, the Law Court has taken issue with "officers' statements to defendants . . . when those statements involve false promises of leniency or misrepresentations about legal rights." Hunt, 2016 ME at ¶ 25; see also State v. Tardiff, 374 A.2d 598 (Me. 1977)(promise of less charges found improper); McConkie, 2000 ME 158 (promises of confidentiality held improper); State v. Dodge, 2011 ME 47 (promise of confidentiality held improper); State v. Wiley, 2013 ME 30 (improper offer of leniency of less jail time). Therefore, " '[a] confession is not voluntary where an interrogating officer, with no more than apparent authority, leads a suspect to believe that a confession will secure a favorable, concrete sentence, and that belief motivates the suspect to confess.'" Hunt at ¶ 28 (quoting Wiley at ¶ 31).

35.     In an effort to clarify its position, the Law Court stated that "*false promises of leniency that induce a confession* are improper and thus will weigh significantly into our consideration of the totality of the circumstances in determining whether a confession must be suppressed." Id. at ¶ 29 (original emphasis). Further, "[a] promise involves leniency when it suggests that the process of prosecution or sentencing will

somehow be 'better' for the defendant if the defendant confesses." Id. (external citations omitted).

36.     In the present case, Officer Jones twice referred to "quality of life" in juxtaposition to his references to *his* ability to lock up Mr. Richardson and "throw away the key." (emphasis added). When phrased like this, Officer Jones is basically saying "I can keep you out of jail (quality of life) if you confess." Otherwise, he will lock him up forever and he and the prosecutor ("we") will take "extreme sentencing measures."

37.     While Officer Jones does say that he could not make any promises, his repeated use of "we" and "I" in conjunction with phrases such as "quality of life" and "lock you up and throw away the key", and "extreme sentencing measures" conveys a direct promise of leniency to Mr. Richardson, a promise Officer Jones cannot deliver on.

38.     From the start of the interview, Mr. Richardson expressed a deep seated fear of going to jail or prison. Officer Jones exploited that fear by making promises that he could, essentially, keep Mr. Richardson out of jail as long as he confessed and/or told the truth. Immediately following Officer Jones's false promises, Mr. Richardson confessed; there can be no doubt Officer Jones's false promises induced Mr. Richardson's confession. Hunt at ¶ 31.

39.     What's more, on two occasions during the interview, Officer Jones refers to some DNA/forensic testing. The State never did any type testing on any of K.D.'s clothes. Finally, Mr. Richardson is, upon information and belief, is not someone of high intelligence which is something the court should also take into account. Id. at ¶ 37.

40.     Therefore, Officer Jones violated Mr. Richardson's due process rights when he induced an involuntary confession and this Court must suppress any

statements Mr. Richardson made to Officer Jones during this first, un-*Mirandized* interview.

### B) Subsequent *Mirandized* Statements

I) Mr. Richardson's Prior, un-*Mirandized* Statements and/or Involuntary Statements Render His Subsequent *Miranda* Waiver and Admissions Involuntary.

41.    There are situations when the police obtain a custodial confession, then give the individual *Miranda* warnings, and subsequently obtain the same or a similar confession. See generally Missouri v. Seibert, 542 U.S. 600 (2004); Oregon v. Elstad, 470 U.S. 298 (1985); State v. Nightingale, 2012 ME 132. Courts sometimes refer to this two-step process as "*Miranda*-in-the-middle" and depending on the specific facts, will exclude both the pre-*Miranda* and post-*Miranda* statements. Compare Seibert at 614 *with* Elstad at 315-316.

42.    When the lack of *Miranda* is more than a mere "oversight" (Elstad at 315-316) the United States Supreme court has found that "[b]y any objective measure . . . it is likely that if interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar content." Seibert at 613. The Court reasoned that:

> Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent . . . A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point . . . telling a suspect that 'anything you cay can and will be used against you,' without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence of being no avail.

<u>Id</u>.

43.     The Court laid out a number of factors courts should examine to determine whether "*Miranda* warnings delivered midstream could be effective enough to accomplish their object." <u>Id</u>. at 615. That is, whether an individual felt as if they had a "real choice between talking and not talking." <u>Id</u>. at 601. Those factors include "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." <u>Id</u>. In the present case, the two interrogations were essentially identical save for the location and the police administering Miranda. Therefore, given the reasoning laid out in Seibert, the similarity of the two confessions, "[n]othing was said or done to dispel the oddity of warning about legal rights to silence and counsel right after the police had led [Mr. Richardson] through a systematic interrogation." <u>Id</u>. at 616.

44.     In <u>Seibert's</u> plurality opinion, Justice Kennedy wrote a concurring opinion. <u>Id</u>. at 618-622. Justice Kennedy agreed "with much in the careful and convincing opinion for the plurality" but he took a slightly different approach. <u>Id</u>. at 618. Justice Kennedy agreed that the technique the police used in <u>Seibert</u> undermined *Miranda's* "meaning and effect." <u>Id</u>. at 621. However, before a court suppresses both pre and post *Miranda* statements, Justice Kennedy would require some showing that the technique used by the police was a deliberate attempt to undermine *Miranda*. <u>Id</u>. at 622.

45.     Despite the Law Court's oft declaration that Maine Constitution provides greater protection than its Federal counterpart (see *supra*), the Law Court adopted

Justice Kennedy's less protective deliberateness test. Nightingale, 2012 ME 132 at ¶ 29. Therefore, "the State bears the burden of demonstrating by a preponderance of the evidence that the two-step procedure was not deliberately employed to undermine the efficacy of the *Miranda* warnings." Id. The Court will examine the "totality of the objective and subjective evidence" in order to determine if the police deliberately undermined *Miranda*. Id. (quoting citations omitted).

46.     However, the Law Court has never addressed a situation where the police induced a pre-*Mirandized* involuntary confession and then obtained the same or similar confession after administering *Miranda*. Under the Maine Constitution's expanded rights, the coercive police tactic of using "*Miranda*-in-the-middle" renders both pre and post *Miranda* statements involuntary and thus, inadmissible, this is especially true when the pre-*Miranda* statements are involuntary and are suppressed because they violate the defendants due process rights.

47.     Indeed, the crux of Seibert, whether reading the lead opinion or Justice Kennedy's concurrence revolves around voluntariness. Seibert, 542 U.S. at 620. Justice Kennedy referenced Justice Souter's opinion with favor when he explained that:

> [T]he two-step technique permits the accused to conclude that the right not to respond did not exist when the earlier incriminating statements were made. The strategy is based on the assumption that Miranda warnings will tend to mean less when recited midinterrogation, after inculpatory statements have already been obtained. This tactic relies on an intentional misrepresentation of the protection that Miranda offers and does not serve any legitimate objectives that might otherwise justify its use.

Id. at 620-621.

48. The Nightingale Court addressed whether the defendant voluntarily confessed. Nightingale, 2012 ME at ¶¶ 31-36. However, Mr. Nightingale never challenged his first, *Mirandized* statements but argued police deception during the first interview rendered his subsequent statements involuntary. Id. Mr. Richardson's case presents a very different situation, a situation where he is challenging his initial involuntary statements. He is also challenging his subsequent, *Mirandized* statements as involuntary. See *supra*. The Nightingale Court did not examine whether the tactic of "Miranda-in-the-middle" violates due process as explained in Hunt. Compare Nightingale at ¶¶ 31-36 *with* Hunt, 2016 ME at ¶¶ 18-21.

49. Therefore, when examining a situation where the police question an individual first and obtain in involuntary confession and only later *Mirandize* them, the court still needs to examine whether the tactic violated due process, whether the individual felt as if he or she had a "real choice"; and whether the waiver and confession were voluntary. Hunt at ¶¶ 19-21. Using "*Miranda*-in-the-middle" can be dispositive with respect to voluntariness and therefore, admissibility. Seibert, 542 U.S. at 613.

50. Based on the reasoning in Seibert and the added Maine State Constitutional protections, when the police use the "Miranda-in-the-middle" technique, the court should find the subsequent confession involuntary. Therefore, in Mr. Richardson's case, based on this reasoning, this Court must exclude all of Mr. Richardson's incriminating statements made to the Bridgton Police.

**WHEREFORE**, the defendant, Mr. Clifford Richardson respectfully requests that this Court:

A) Suppress both pre-*Miranda* and post-*Miranda* statements

B) Hold a hearing and hear evidence on this Motion;

C) Issue a written order of facts and law; and

D) Grant such further relief as serves justice.

Respectfully Submitted,

Dated: ___2/2/17___

_____
Devens M. Hamlen, Esq.
Maine Bar No.: 9973
Attorney for the Defendant

H&H LawCenter, P.A.
22 Monument Sq., Suite 404
PO Box 4784
Portland, ME 04112
207.221.6363
dhamlen@hhlawcenter.com

## CERTIFICATE OF SERVICE

I, Devens M. Hamlen, do hereby certify that on this date, I have delivered a copy of the foregoing attached Motion to Suppress to:

Cumberland County District Attorney's Office
142 Federal Street
Portland, ME 04101

Dated: ___2/2/17___

_____
Devens M. Hamlen, Esq.

## ORDER

The defendant has filed a motion to suppress statements he made to a Bridgton police officer. I have listened to the statements.

The first statement took place in a police cruiser outside his home. The interrogation lasted about 90 minutes, was conducted by one officer with no other officers present, no police dog was present, there was no restraint placed on the defendant and the police initiated contact was conducted professionally. I find that the state has proven by a preponderance of the evidence that Mr. Richardson was not in custody. Miranda warnings, which were not given, were not required.

I also find that the defendant's statements in the police cruiser was voluntary beyond a reasonable doubt. They were the free choice of a rational mind, were not the product of coercive police conduct and their admission would be fundamentally fair. There were no specific promises made. Also see State v Wiley, 2013 ME 30, ¶ 34.

A second statement was given at the police station after Miranda warnings were given. The defendant had some hesitation as to whether he would talk and the police officer at one time suggested that the defendant could talk to him now or later. Overall the State has proven, based on a totality of the circumstances, that a valid waiver exists. Likewise, the second statement was voluntary beyond a reasonable doubt.

The entry is:

Motion to suppress is denied.

March 4, 2017

Paul A. Fritzsche
Active Retired Justice, Superior Court